IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>LESTER T. JONES, JR. | Criminal Action No.<br><br>No. 1:25-CR-458-JPB |

## Government's Sentencing Memorandum

The United States of America, by Theodore S. Hertzberg, United States Attorney, and Bernita B. Malloy, Assistant United States Attorney for the Northern District of Georgia, files this Memorandum in preparation for the sentencing of LESTER T. JONES JR. ("Defendant").

### 1.  Introduction

On December 16, 2025, Defendant entered a negotiated plea to a one-count information charging him with wire fraud in violation of 18 U.S.C. § 1343.  (Doc. 12-1).  In the Final Presentence Report ("PSR"), Probation computed Defendant's total offense level to be 22.  (PSR ¶ 81).

Starting with the base offense level of 7 for a violation of 18 U.S.C. § 1343, Probation added 18 points for a loss amount exceeding $3,500,000. (*Id.* at ¶¶ 73–

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

74). Pursuant to §3B1.3, 2 points were added to the adjusted offense level because Defendant was in a position of private trust. (*Id.* at ¶ 76). Probation then subtracted 3 points for acceptance of responsibility. (*Id.* at ¶ 79). Probation also subtracted 2 points because Defendant meets the criteria of a zero-point offender, resulting in a total offense level of 22. (*Id.* at ¶ 80).

Defendant has no criminal history points, so his criminal history category is I. (*Id.* at ¶¶ 86–87). Defendant's total offense level of 22 and criminal history category of I resulted in a guidelines range of 41-51 months. (*Id.* at p. 32). For the reasons set forth below, the Government recommends that the Court impose a custodial sentence of 41 months and restitution of $3,764,514.30.

## 2.  Factual Background

Beginning in or about May 2017 through June 2025, Defendant, JONES, engaged in a scheme to defraud the ATL. HAWKS, LLC ("HAWKS") by (1) submitting fictitious and altered business expense invoices to be reimbursed, and (2) charging millions of dollars in personal expenses, which included overseas travel, luxury designer items, wristwatches, and car expenses, through false and fraudulent statements and directives to HAWKS employees, including to JONES' subordinates in the Accounting and Finance Department. (*Id.* at ¶ 7). Through these two methods, Defendant defrauded the HAWKS out of over $3.7 million. (*Id.*).

Defendant JONES was initially hired by the HAWKS as Director, Financial Planning & Analysis, in or about March 2016 for its Atlanta office. (*Id.* at 9).  In or about July 2018, Defendant was promoted to Vice President, Financial Planning & Analysis. (*Id.*). Beginning in or about August 2021 to July 2025, Defendant assumed the title of Senior Vice President, Finance. (*Id.*).

Although his duties evolved over time, he was responsible for administering the HAWKS' corporate credit card account with American Express ("AMEX"), employee expense reimbursements, and administering the HAWKS' electronic expense reimbursement platform among other things. (*Id.* at ¶¶ 10-13). In this role, Defendant JONES supervised HAWKS employees who operated the reimbursement platform, handled expense reimbursements, and approved payments to AMEX, individual employees, and others. (*Id.*). Defendant also had access to a corporate AMEX credit card which he was only allowed to use for legitimate business expenses. (*Id.*).

Critically, Defendant JONES had special access to and insight into any limitations with the HAWKS' internal financial system. (*Id.* at ¶ 13). Prior to July 2024, the HAWKS' expense reimbursement platform did not display actual corporate credit card transactions to the employees responsible for processing reimbursements. (*Id.*). This meant that the very employees Defendant supervised

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

could not verify whether submitted invoices matched actual card charges. (*Id.*). Defendant knew of this flaw. And he exploited it for personal gain. (*Id.*).

To complete an expense reimbursement request, a company employee submitted certain information electronically, including an expense report, invoice, receipt, or other document substantiating the expense(s), and certification that the report was true and accurate. (*Id.* at ¶¶ 13-14). By virtue of his position, Defendant JONES submitted and directed the submission of dozens of fraudulent expense reimbursement requests by using fictitious and altered invoices, that caused the HAWKS to reimburse him for business expenses that he had not incurred or did not exist. (*Id.*). He also and contrary to the HAWKS policy, charged millions of dollars in personal expenses to HAWKS' corporate credit cards without the HAWKS' knowledge and authorization, including but not limited to travel to the Bahamas, Costa Rica, Hawaii, Las Vegas, Mexico, Puerto Rico, Switzerland, and Thailand, Louis Vuitton apparel, jewelry, Porsche car expenses, and tickets to concerts and sporting events. (PSR ¶¶ 7, 14).

To facilitate this scheme, Defendant JONES intentionally manipulated financial reports prepared for internal planning and budgeting purposes, doctored e-mail messages that were provided to legitimize transactions, and falsely attributed large balances on a corporate AMEX credit card to Team

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

operations and to divert attention away from his unauthorized personal charges he incurred. (*Id.* at ¶ 7).

For example, at the direction of Defendant JONES, S.D., an employee in the HAWKS' Accounting and Finance Department, prepared and submitted an electronic expense reimbursement request for Defendant JONES in the amount of $229,968.76 for charges supposedly incurred by the HAWKS at the Wynn Hotel in Las Vegas, Nevada for the NBA Emirates Cup. (Doc. 1 ¶ 6). The reimbursement request attached a doctored email and a doctored Wynn Hotel invoice provided by Defendant JONES in the amount of $229,968.76 that referenced "NBA Emirates Cup, Tickets, Credentials, Logistics, Room." (*Id.*). Defendant JONES in his capacity as Senior Vice President for the HAWKS approved the $229,968.76 expense reimbursement request which he knew was fraudulent because no HAWKS American Express credit card or HAWKS personnel incurred a charge in the amount of $229,968.76 and no such invoice was ever issued by the Wynn Hotel. (*Id.*).

As a result of Defendant's conduct, the HAWKS suffered a loss of over $3.7 million. (PSR ¶¶ 7, 15). The scheme was discovered when an internal investigation into the HAWKS' nonprofit foundation revealed its nonprofit status had lapsed, and the resulting inquiry exposed Defendant's fraud. (*Id.* at ¶ 15).

### 3. A 41-month Custodial Sentence Comports with the Factors Set Forth in 18 U.S.C. § 3553(a).

Congress provided, through 18 U.S.C. § 3553(a), the objectives and factors for district courts to consider in imposing a "sentence sufficient, but not greater than necessary, to comply with" the basic aims of sentencing, which include: (1) the nature and circumstances of the offense and history and characteristics of the Defendant; (2) the need for the sentence to reflect the seriousness of the offense and promote respect for the law; (3) the need for adequate deterrence; (4) the need to protect the public; (5) the need to provide the Defendant with educational or vocational training or medical care; (6) the kinds of sentences available; (7) the guidelines range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(1)-(7).  "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court."  *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007) (quotation marks omitted).  The most pertinent Section 3553(a) factors in Defendant's case are set forth below.

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

### A. The Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1)

This Court should consider Defendant's culpability in this scheme when assessing the nature and circumstances of the offense.  Here, Defendant was the sole architect of a scheme in which he deliberately submitted falsified invoices, doctored emails, and fraudulent reimbursement requests for the purposes of perpetrating this fraud. (*Id.* at ¶ 7).

For example, in November 2016, Defendant developed and issued the HAWKS' expense reimbursement policy, which prohibited personal use of corporate credit cards. (*Id.* at ¶ 11). Beginning in 2017, and in deliberate disregard of that policy, Defendant began charging personal expenses to corporate credit cards and submitting fraudulent reimbursement requests to finance a lifestyle of excess including, and among other things, $137,500 on Beyonce concert tickets, $32,250 on three nights of Taylor Swift, $115,795 on a diamond engagement ring, $225,000 on luxury watches, vacations at luxury resorts in the Bahamas and Thailand, and first class ticket to Phuket. (*Id.* at ¶¶ 20–21, 23-24, 39). These facts not only demonstrate Defendant's culpability, but also the predatory nature of the scheme.

Defendant was able to perpetrate this scheme because of the trust his employer placed in him. The HAWKS entrusted Defendant with the financial integrity of their organization, made him their Vice President of Finance and

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

most senior accounting executive below the Chief Financial Officer, and tasked him with overseeing expense reimbursements to ensuring compliance with company financial policies. (*Id.* at ¶¶ 9–13). In return, Defendant used their trust to fund a lifestyle he could not afford on his own, financing concert ticket, luxury watches, and first-class flight on their dime. (*Id.* at ¶¶ 20–21, 23-24, 39).

Furthermore, this Court should also consider the magnitude and extent of this fraud and how it reflects the nature of the offense. This scheme was a continued course of criminal conduct, taking place over the duration of eight long years. (*Id.* at ¶ 7). During this time, Defendant had ample opportunity to stop, but he did not. Instead, he continued to defraud the HAWKS until his conduct was discovered, resulting in a total loss of over $3.7 million. (*Id.* at ¶ 15). Thus, a 41-month custodial sentence would appropriately reflect the nature and circumstances of this offense and the potential harm associated with the fraud scheme.

## B.  History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)

Defendant's background and personal characteristics do not support leniency. To the contrary, they show the deliberate nature of his offense. The Government recognizes that Defendant experienced a difficult childhood marked by poverty, abuse, and the realities of growing up as a black person in rural Mississippi in

the 1980s and reached the pinnacle of his career. (*Id.* at ¶¶ 99–105, 113–117).

However, Defendant overcame those circumstances and decided to make a life

for himself. He graduated from the Mississippi School for Mathematics and

Science in 1997. (*Id.* at ¶ 144). He earned a Bachelor of Science in accounting,

statistics, and advanced mathematics from Xavier University in 2001 and a

Master of Finance from Tulane University in 2002. (*Id.* at ¶ 145). He has worked

in finance since graduating college and is a Certified Public Accountant (CPA)

candidate with expertise in mathematics, statistics, and on the job finance

training. (*Id.* at ¶ 147). He rose to the position of Vice President of Finance for the

HAWKS in August 2021. (*Id.* at ¶ 9). In 2023, while deliberately and intentionally

defrauding his employer, he was honored with a Medal of Leadership as a

Visionary Leader. (*Id.* at ¶ 146). In 2025, he received the Rising Leader Award

from the Pro Sports Assembly. (*Id.*).

   Defendant's sister has described Defendant as intelligent, resilient, and able to

"push through" adversity. (*Id.* at ¶ 120). The same qualities that enabled

Defendant's success enabled him to sustain a fraud scheme for eight long years

without detection. Defendant's fraud scheme was not out of desperation or

ignorance, but out of pure greed. He held a senior executive position, earned a substantial salary, and possessed the education and training to understand exactly what he was doing, and chose to do it anyway. Accordingly, Defendant's history and characteristics strongly support a 41-months custodial sentence.

C. **The Need to Reflect the Seriousness of the Offense, To Promote Respect for the Law, and To Promote Just Punishment for the Offense, 18 U.S.C. § 3553(a)(2)(A)**

Throughout the eight-year duration of the fraud scheme, Defendant showed little respect for the law. By profiting from his lies and deception, Defendant demonstrated a willingness to prioritize his personal interest and desire for the "high life" over his obligations to his employer and the law. Wire Fraud is a serious offense that causes significant harm to individuals and businesses. *See United States v. Biltres*, 598 F. App'x 740, 742 (11th Cir. 2015) ("The kind of harm caused by offenses such as Biltres's fraud is serious."). This was not a one-off scheme. Here, Defendant perpetrated his fraud over the course of eight years, resulting in an extensive period of harm to the HAWKS. (*Id.* at ¶ 7).

The seriousness of this offense is compounded by the trust Defendant violated. The HAWKS did not simply employ Defendant; they cultivated a close relationship with him and trusted him with their finances. (*Id.* at ¶¶ 9–13).

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

Defendant served as Vice President of Finance, the most senior accounting executive below the Chief Financial Officer. (*Id.* at ¶ 9). He developed and violated the same expense reimbursement policy he created. (*Id.* at ¶ 11). He administered the corporate credit card program. (*Id.* at ¶ 12). He supervised the employees who processed reimbursements. (*Id.* at ¶ 13). The HAWKS placed their trust in Defendant's authority and integrity as a long-standing employee and senior executive. Defendant exploited that trust for eight years.

As a result of conduct like Defendant's, honest businesses lose money, credibility, and the ability to trust those they place in positions of financial authority. Given the seriousness of the offense, the financial harm to the HAWKS, and the profound breach of trust, the Court should impose a 41-month custodial sentence and restitution to provide just punishment and promote respect for the law.

**D. The Need to Afford Adequate Deterrence to Criminal Conduct, 18 U.S.C. § 3553(a)(2)(B)**

In the context of a prosecution for Wire Fraud and White-Collar Crime, it is particularly important that the sentence imposed promote general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B); *United States v. Howard*, 28 F.4th 180, 208 (11th Cir. 2022) ("Congress, the United States Sentencing Commission, and this Court have all decided that general deterrence is a critical factor that must be considered and

should play a role in sentencing Defendants, including those who wear white collars.").  Under this factor, the value of the sentence lies in its ability to deter others who may be tempted to engage in similar conduct.  To meet these ends, the Eleventh Circuit has repeatedly recognized and endorsed the ability of adequately firm sentences to send effective deterrent messages, stating: "Defendants in white collar [cases] often calculate the financial gain and risk of loss, and White-Collar Crime therefore can be affected and reduced with serious punishment."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

Wire Fraud constitutes a constant and significant threat to citizens in the United States.  In the past year, consumers have reported upwards of $12.5 billion in losses to fraud.  *See New FTC Data Show a Big Jump in Reported Losses to Fraud to $12.5 Billion in 2024*, FED. TRADE COMM'N, (Mar. 10, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/03/new-ftc-data-show-big-jump-reported-losses-fraud-125-billion-2024.[1]  Employees who exploit their positions of trust account for a significant share of this problem. In

---

[1] The significant importance of deterring Wire Fraud is only increasing.  The number of losses to fraud reported by the Federal Trade Commission in 2024 grew by $2.5 billion from 2023.  *See As Nationwide Fraud Losses Top $10 Billion in 2023, FTC Steps Up Efforts to Protect the Public*, FED. TRADE COMM'N, (Feb. 9, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/02/nationwide-fraud-losses-top-10-billion-2023-ftc-steps-efforts-protect-public.  Seemingly, potential fraudsters have not been adequately deterred and are growing bolder.

fiscal year 2024, federal courts sentenced 5,312 individuals for fraud, theft, or embezzlement, making it the fourth largest category of federal crime.[2] The losses from such crimes are substantial. In the United States, the median loss per occupational fraud case is $500,000, and organizations lose an estimated five percent of their annual revenue to fraud committed by their own employees.[3] Employees in positions like Defendant's cause the greatest harm. Perpetrators at the executive level cause a median loss of $500,000, more than eight times the loss caused by staff level employees.[4]   Perpetrators in finance departments cause a median loss of $285,000, among the highest of any department.[5] Defendant's theft of $3.7 million was more than seven times the median loss caused by

---

[2] U.S. SENT'G COMM'N, *Annual Report 2024*, at 18 (2025), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/2024-Annual-Report.pdf (reporting that fraud, theft, and embezzlement cases accounted for 9% of the total federal caseload in fiscal year 2024).

[3] ASS'N OF CERTIFIED FRAUD EXAM'RS, *Occupational Fraud 2024: A Report to the Nations* 9 (2024), https://www.acfe.com/-/media/files/acfe/pdfs/rttn/2024/2024-report-to-the-nations.pdf (reporting that the median loss per case in the United States and Canada was $500,000 and estimating that organizations lose 5% of revenue to occupational fraud annually).

[4] *Id.* at 52.

[5] *Id.* at 70.

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

executive level perpetrators and thirteen times the median loss caused by perpetrators in finance departments. (*Id.* at ¶ 15).

Accordingly, a 41-month custodial sentence and restitution will send a message to both Defendant and other potential offenders in positions of financial authority that exploiting their employer's trust for personal gain will result in meaningful consequences. Employers must be able to trust those they place in charge of their finances. That trust cannot be maintained if employees who abuse it face minimal punishment.

### E.  The HAWKS Rrequest the Court Order Defendant to Pay Insurance Deductible Cost, Legal and Consulting Fees, and Attorney Fees

As set forth in the Hawks Victim Impact Statement and Declaration of David M. Chaiken attached hereto as **Exhibit 1** to this Sentencing Memorandum, the Hawks are seeking restitution in the amount of $183,972.69, which is comprised of (1) the Hawks $50,000 deductible under the insurance policy with Liberty Mutual plus (2) $133,972.69 in legal and consulting fees and costs of Chaiken Ghali LLP and J.S. Held LLC incurred by the Hawks in connection with the team's assistance with, and participation in, the criminal investigation and prosecution.  Separately, the Hawks Victim Impact Statement and Declaration of David M. Chaiken identify $280,442.50 in legal and consulting fees and costs of Chaiken Ghali LLP and J.S. Held LLC incurred by the Hawks in connection with the Hawks internal investigation into the misconduct, which are not eligible for

restitution but should be added to the loss amount attributable to the Defendant pursuant to Section 2B1.1 of the U.S. Sentencing Guidelines. The government notes that the inclusion of this amount does not alter the Guidelines range in this case.

### F.  Conclusion

For the foregoing reasons, in addition to any argument the Government offers at the sentencing hearing, the Government respectfully requests that the Court impose a custodial sentence of 41 months imprisonment and order Defendant to pay restitution in the amount of **$3,764,514.30.** Should the Court grant the HAWKS' request for victim restitution, the government requests that the court order Defendant to pay restitution in the amount of **$3,898,486.99.**

April 8, 2026                                        Respectfully submitted,

THEODORE S. HERTZBERG
*United States Attorney*

/s/ *BERNITA B. MALLOY*
BERNITA MALLOY
   *Assistant United States Attorney*
Georgia Bar No. 718905
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
404-581-6052; Fax: 404-581-6181

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Brett Switzer

April 8, 2026

/s/ BERNITA B. MALLOY
BERNITA B. MALLOY
*Assistant United States Attorney*