

April 6, 2026

Via Electronic Mail
bernita.malloy@usdoj.gov

The Honorable J.P. Boulee
U.S. District Judge
c/o Bernita B. Malloy, Esq.
Assistant U.S. Attorney
United States Attorney's Office
75 Ted Turner Drive S.W., Suite 600
Atlanta, Georgia 30303

**Re:    Victim Impact Statement of ATL Hawks, LLC**
**_United States v. Lester T. Jones, Jr._, No. 1:25-CR-458-JPB (N.D. Ga.)**

Dear Judge Boulee,

On behalf of ATL Hawks, LLC (the "Hawks" or the "Company"), owner of the NBA's Atlanta Hawks professional basketball team and operator of Atlanta's State Farm Arena, I respectfully submit this victim impact statement in connection with the above-referenced case.

I am the Executive Vice President & Chief Legal Officer of the Hawks. I assumed responsibility for all Hawks legal matters more than two decades ago, in 2004, which makes me one of the longest-serving executives in the Hawks organization. Before joining the Hawks, I served as Assistant General Counsel for Turner Sports, Inc., providing legal support to all Turner Sports properties, including the Hawks, the Atlanta Thrashers, the Atlanta Braves, World Championship Wrestling, TNT Sports, and The Goodwill Games, and I also spent several years as a Judge Advocate General in the United States Marine Corps and as a lawyer in private practice. I was initially licensed to practice law in North Carolina and the District of Columbia in 1988 and have been licensed in Georgia since 1999.

Because of my long tenure with the Company and my participation in the discovery of, and investigation into, the misconduct that led to the above-referenced criminal case against Mr. Jones, I am uniquely positioned to speak to the impact of Mr. Jones's misconduct on the Hawks.

### Mr. Jones's Employment with the Hawks

Mr. Jones was employed in the Accounting and Finance Department of the Hawks between March 2016 and June 2025, working out of the Company's corporate offices in Atlanta. At the time of Mr. Jones's termination by the Hawks in June 2025, Mr. Jones was serving as Senior Vice President, Financial Planning & Analysis. The Hawks initially hired Mr. Jones in



March 2016 as Senior Manager, Financial Planning & Analysis, reporting to Hawks former Chief Operating Officer Thad Sheely. In July 2018, Mr. Jones was promoted to Vice President, Financial Planning & Analysis, and in August 2021, he was promoted to Senior Vice President, Finance, reporting directly to Hawks Chief Financial Officer ("CFO") Joel Browning upon the Hawks hiring Mr. Browning as CFO in September 2021. Between 2018 and his termination on June 30, 2025, Mr. Jones was the most senior accounting executive in the Company next to the CFO. As part of his corporate duties, Mr. Jones served as the Hawks' program administrator for the Hawks corporate American Express account, allowing him direct supervision and control over the corporate credit card accounts, as well as the Hawks' administrator for the Company's electronic expense reimbursement platforms.

In addition, in September 2017, Mr. Jones was appointed Treasurer of the Atlanta Hawks Foundation (the "Hawks Foundation" or the "Foundation"), a Section 501(c)(3) nonprofit organization, and he served in that position until his separation from the Company in June 2025.[1]

By virtue of these positions, the Hawks placed enormous trust in Mr. Jones's integrity and credibility. Further, as a Vice President and later Senior Vice President, Mr. Jones was an officer of the Company and thus owed fiduciary duties to the Hawks.

### Discovery of the Fraud

On or about June 25, 2025, advisors to a donor to the Hawks Foundation were performing diligence and discovered that the Foundation's Section 501(c)(3) status had been revoked. Representatives of the donor notified the Hawks, and the Hawks in turn questioned Mr. Jones, who, as the Foundation's Treasurer, was responsible for maintaining the Foundation's books and records and working with its outside auditors, KPMG, to file the Foundation's annual tax returns. Mr. Jones had signed the Foundation's tax engagement letter with KPMG and was KPMG's sole point of contact with the Foundation.

It turned out that Mr. Jones, either knowingly or unknowingly, had neglected this critical duty for 3 years, resulting in an automatic revocation of the Foundation's charitable status. When questioned about the Foundation tax returns and revocation, Mr. Jones stated that he had filed past returns and recently requested an extension to file the previous years' tax returns. Mr. Jones' statements were not true, which led to the scheduling of a meeting with Mr. Jones to terminate him for cause on June 30, 2025.

On the morning of June 30th, however, prior to the scheduled termination meeting, Hawks CFO Joel Browning began reviewing certain information associated with the Hawks corporate American Express credit card accounts as part of the transition of the administration of

---

[1]    The mission of the Foundation is to "continue to grow the Atlanta Hawks as a community asset by building bridges through basketball. We provide safe access to play, as well as community opportunities for mental & physical wellness and economic empowerment." (https://www.nba.com/hawks/atlanta-hawks-foundation). Thankfully, the Hawks found no irregularities with any Hawks Foundation accounts.



the accounts from Mr. Jones to a different employee. Among other irregularities, Mr. Browning discovered what appeared to be significant personal charges in June 2025 American Express corporate credit card statements for cards in the name of Mr. Jones, including a $38,500 charge to an entity named "LLVC Bahamas" and an approximately $32,000 charge to the retail store, Saks Fifth Avenue.

Mr. Browning then began reviewing the prior year of American Express statements for Mr. Jones's corporate credit cards. This preliminary review uncovered additional purchases at Saks Fifth Avenue and other luxury retail stores and hotels that appeared to be personal and that did not appear to be authorized or for Hawks business purposes. Mr. Browning and I then questioned certain additional employees in the Hawks' Accounting and Finance Department. The questioning revealed that, on multiple occasions from June 2024 to May 2025, Mr. Jones ordered his subordinates in the Accounting and Finance Department to cause the Company to issue corporate funds from the Hawks operating account at Bank of America directly to American Express to pay off his corporate credit card balances without any documentation supporting or justifying the expenses, in violation of Company policies.

We then retained Chaiken Ghali LLP to assist us in conducting an internal investigation, and authorized Chaiken Ghali to engage the forensic accounting firm, J.S. Held LLC.

### Mr. Jones Initially Appears Cooperative, But Instead Obfuscates

Mr. Jones initially appeared to be willing to cooperate and agreed to meet with Company human resources, legal, and accounting executives within days of his termination to discuss the suspicious credit card charges. Unfortunately, in that July 1, 2025 meeting, Mr. Jones instead chose to obfuscate and divert attention.

For example, Mr. Jones claimed that the significant personal spending on the corporate American Express credit cards was caused by his two cousins who had been living at his house, even providing their names. When confronted with over $14,000 in travel, hotel, and Louis Vuitton retail store expenses for an extravagant trip to Thailand that he clearly charged himself and fraudulently caused the Hawks to pay for, Mr. Jones filibustered, stating that Louis Vuitton was supposed to have paid for the hotel and that it should not have been charged to the Hawks. When confronted with the early (albeit incorrectly low) estimate of the unauthorized personal expenses as of that date—$1.6 million—Mr. Jones initially falsely stated that he "didn't think [the amount] was anything like that."

Later in the meeting, Mr. Jones falsely stated that the loss was no greater than that amount. In other words, he falsely suggested that the Hawks had already found all of the relevant losses. Asked "if there's anything else related to bank accounts in the company," so that [the CFO] and [Human Resources Director] and I don't have to spend the next 6 months unraveling this mess," Mr. Jones falsely answered, "no." And asked to confirm that his abuse "of company



resources [was] just credit . . . Amex credit card . . . That's it," Mr. Jones falsely stated, "100 percent."

Following that initial interview, as the Company continued to unravel the fraud, Mr. Jones agreed to a second interview, which took place on July 15, 2025. But once again, Mr. Jones avoided providing concrete information that might have streamlined the internal investigation and reduced costs. Instead, the interviewers were left with the impression that Mr. Jones was more interested in determining what instances of fraud the Company had already discovered to date. Mr. Jones had the opportunity to admit to the approximately two dozen forged documents that he had created and submitted in support of over $2 million in fraudulent expense reimbursement requests, and he could have saved the Company the time and expense of identifying and deciphering those forgeries, but he did not provide any such assistance. He minimized the scope of the fraud, falsely claimed that his personal use of the corporate credit cards had only begun nine or ten months earlier, and falsely stated that he did not know if he had submitted fraudulent expense reimbursement requests (*i.e.*, the forgeries), but that it was "possible."

Mr. Jones had additional opportunities to provide information and documents that could have streamlined the investigation and reduced the Hawks' professional fees, including after the criminal investigation began, during and in preparation for a February 6, 2026 meeting with the Company, J.S. Held LLC, the U.S. Attorney's Office, the FBI, Mr. Jones, and Mr. Jones's defense attorney to discuss the Hawks forensic analysis of the losses. But for the most part, Mr. Jones did not provide any meaningful information. And the Company shouldered this additional effort and expense in an attempt to ensure the accuracy of the loss and restitution calculations.

The Hawks' interactions with Mr. Jones since June 30, 2025 have followed a similar pattern. Mr. Jones has always been quick with a teary, generic apology, but he has repeatedly declined the opportunity to provide documents or information to streamline the process and to reduce the time and resources needed to "unravel[] [the] mess."

### **Financial Impact**

As set forth in the Criminal Information and Mr. Jones's guilty plea proceedings in this case, the internal investigation determined that Mr. Jones perpetrated two employee theft schemes against the Hawks— (1) the submission of fictitious expense reimbursement requests, and (2) the misuse of Hawks corporate credit cards for personal expenses—which collectively caused a loss in the amount of $3,808,618.28. The Company and its insurance carrier, Liberty Mutual, agreed to settle the Hawks' insurance claim for a theft loss amount of $3,768,188, which represented $3,808,618.28 less deductions of $1,911.37 from the losses suffered by the Hawks and $38,518.91 in losses that were not borne by the Hawks, but instead by American Express. The insurance settlement resulted in payments by Liberty Mutual to the Hawks of (1) $3,718,188, which represented the insurance settlement amount less the Hawks $50,000



policy deductible, and (2) $100,000 in investigative costs for the Hawks internal investigation, for a total of $3,818,188.

Further discussions and negotiations between the USAO and defense counsel have resulted in an adjusted theft loss amount of $3,764,514.30. It is critical for the Court to understand that in calculating these losses, the Hawks reached to apply every benefit of the doubt in favor of Mr. Jones, and thus these calculations are extremely conservative. By way of example, under the Hawks travel and expense reimbursement policy that Mr. Jones himself helped create and issue, business expenses charged to Company credit cards would not be reimbursed unless they were submitted with proper backup documentation within 90 days. But our calculations permitted Mr. Jones to receive credit for (and, thus, excluded from loss and restitution), numerous expenses that Mr. Jones simply charged to his Hawks American Express credit card account and never sought reimbursement nor provided a receipt or justification despite the passage of years. In addition, in instances where Mr. Jones was credited for a business trip despite never having submitted proper documentation or justification, in our calculations Mr. Jones received full credit for all airfare, food, and hotel costs that he charged for such trips even though Mr. Jones typically booked first-class airfare in violation of his own policy and exceeded the daily maximum spending limit for meals ($90). In other words, we credited the full amount and did not attempt to parse the portion of the airfare that would have been attributable to a standard coach seat or the portion of a dinner that exceeded the daily meal allowance.[2]

In addition to the theft loss amount, as set forth in the Declaration of David M. Chaiken that is attached hereto as Exhibit 1, the Hawks have incurred $454,820.68 in fees and costs for legal and forensic accounting services from Chaiken Ghali LLP and J.S. Held LLC on this matter through March 31, 2026. Ex. 1 ¶ 19. Of this amount, $280,442.50 is attributable to the internal investigation, and $133,972.69 is attributable to participating in and assisting the USAO and FBI with the criminal investigation. *Id.* ¶¶ 21, 25.

It is my practice to carefully monitor legal and professional services performed for the Hawks by outside counsel, consultants, and others to ensure that any work is being performed in an efficient manner and that fees and cost are reasonable, and I applied that same practice to this matter. I also know based on my experience handling such matters over the past two decades and based on conversations with fellow chief legal officers in other organizations that the fees and costs that we incurred in this matter are a small fraction of what firms of comparable experience and expertise typically charge to handle such matters.

Based on information previously provided by the Hawks and the USAO to the U.S. Probation Office and the attached Declaration, the Hawks seek restitution from Mr. Jones in the

---

[2]     Along similar lines, it should be noted that Mr. Jones's illicit personal credit card spending enabled him to amass astronomical credits in various customer loyalty programs, including Delta SkyMiles and a Louis Vuitton rewards program. For practical reasons, the Hawks only made a few unsuccessful cursory attempts to quantify or claw back these points and associated benefits.



amount of $183,972.69, which represents the Hawks $50,000 policy deductible plus $133,972.69 in professional fees and costs incurred in connection with the criminal investigation.

### Non-Financial Impact & Additional Investigative Findings

Putting aside the financial impact of the crime, Mr. Jones's misconduct was an enormous betrayal to the Company that had given him the biggest break of his career—the opportunity to work in the prestigious Accounting and Finance Department for a prominent NBA team and for a world-renowned arena. Specifically, Mr. Jones owed the Company fiduciary duties and was entrusted with enforcing Company policies and procedures governing expense reimbursements and corporate credit card usage, which are critical to the Company's operations and its financial reporting obligations to internal and external stakeholders. Incredibly, Mr. Jones violated some of the very policies that he drafted and was responsible for administering, such as the Hawks travel and expense reimbursement policy. This was a significant abuse of trust by Mr. Jones, for his personal benefit and to the substantial detriment of the Hawks. We ask that the Court consider this as a significant additional aggravating factor in determining Mr. Jones's sentence.

The misconduct has also exacted a significant emotional toll on other Hawks employees and caused the Hawks to allocate time and resources to this matter when it could have instead been devoted to more positive and productive endeavors. Below are some of the investigative findings that offer additional context for the crime and its overall impact on the Company.

The investigation revealed that Mr. Jones made several false statements to the Hawks when he applied for employment in 2016. These included false representations by Mr. Jones that he was a licensed CPA, that he had obtained an MBA from Tulane University, and that he left his previous position at Home Depot voluntarily. The Hawks found out during the investigation that Mr. Jones was not a CPA (and never had been), that he obtained a Master's degree in accounting from Xavier University of Louisiana but not a Tulane University MBA degree as stated in his application, and that he did not in fact leave Home Depot voluntarily. In fact, the Hawks discovered that Home Depot had terminated Mr. Jones for submitting tens of thousands of dollars in false employee expense reimbursement requests, a precursor to the multimillion-dollar fraud that he later perpetrated against the Hawks. Unfortunately, the Company only discovered these lies piecemeal in late 2025 during the Company's investigation of Mr. Jones's misconduct. Had the Hawks known of these facts at the time, Mr. Jones never would have been hired.

In this sense, Mr. Jones's entire employment with the Hawks was based on a lie, and the Hawks never received the full benefit of the bargain for his salary, which rose from $90,000 in 2016 to nearly $300,000 in July 2025. In addition, when Mr. Browning joined the Hawks as the new CFO in September 2021, he had the opportunity to re-evaluate and re-organize the Accounting and Finance Department, which included Mr. Jones. Mr. Browning chose to retain Mr. Jones as the senior most accounting executive in the Company and to defer the task of re-assessing Mr. Jones's responsibilities and areas of supervision until a later date, based in large



part on the false representation by Mr. Jones—made directly to Mr. Browning in 2021—that Mr. Jones was a CPA. Notably, Mr. Jones committed the overwhelming majority of the fraud between 2021 to 2025.[3]

Moreover, obtaining employment with the Hawks was a huge career breakthrough for Mr. Jones. Between 2016 and 2025, Mr. Jones had every opportunity to progress and grow in his career honestly through hard work and stellar performance. He fully understood and knew that was the true path to success.[4] Instead, it appears that shortly after becoming employed by the Company, he began testing the Company's systems and controls to see what theft he could get away with by using his Company-issued American Express credit card for random, non-expensable personal items. When these initial personal charges went undetected, Mr. Jones appears to have begun boldly increasing his fraudulent and unauthorized credit card spending over the years to include extravagant personal purchases such as luxury handbags and luggage, high-end men's and women's clothing, multiple six-figure jewelry purchases, a Wynn Hotels Bahamian time share ownership purchase for himself and a girlfriend, and hotel and airfare expenses for multiple international trips for not only himself but also for his friends and family.

The investigation also revealed cultural and interpersonal damage that Mr. Jones inflicted upon the Company as part of his misconduct. Specifically, the investigation revealed that Mr. Jones climbed the ranks from serving as a Director to becoming a Senior Vice President in the Company's Accounting and Finance Department through a combination of attrition and manipulation. He manipulated subordinate employees who were most often minority women into falsely believing that their boss (often a white male executive) did not like them and would not support them internally if, for example, they became pregnant and needed to take maternity leave. Mr. Jones would then falsely assume the role of confidante and protector, to gain their loyalty and trust, and leading these employees to believe that he was saving them from being terminated by their allegedly vindictive and terrible boss.

To many of these employees, Mr. Jones achieved a kind of "hero" status. He would then cement his hero status by showering his "protected" employees with meals, trips, and gift cards that, unbeknownst to the Hawks and the employees, he was causing the Hawks to pay for unwittingly. For example, Mr. Jones was renowned throughout the Company for picking up the bar tab in the restaurant in the Company's office building, with employees (and some non-employees), posting at the restaurant bar after work for many years to receive free food and drink, all courtesy of Mr. Jones's Company American Express card. Everyone in Mr. Jones's

---

[3]    The Hawks understand that there is legal authority for the proposition that in certain circumstances a portion of a faithless or dishonest employee's salary may be included in loss and restitution calculations, however, for practical reasons the Hawks are not seeking to engage in that exercise here.

[4]    In 2023, Mr. Jones received a "Visionary Leadership Award" from Pro Sports Assembly, an affinity group of professional sports executives. In his promotional video posted online following his acceptance of the award, Mr. Jones credited his moral upbringing, his strong personal values, his integrity and his work ethic for all of his career and leadership "success" to date – at the exact same time he was stealing from the Company and expanding his ongoing criminal activity. In the end, Mr. Jones "visionary leadership" was to simply instill fear, divide employees by race and title, then buy subordinate and peer loyalty with the Company's money, both figuratively and literally.



orbit knew his famous catch phrase, "I got you." But only in hindsight do we know that what this actually meant was that Mr. Jones would take care of you with the Company credit card.

And in truth and in fact, each "protected" employee's boss was not angry nor targeting the employee at all, but this manipulation caused wide-ranging internal cultural damage in the form of unfounded paranoia and distrust. The Company is still working to remedy the deep emotional and cultural harm, a devastating impact not captured in a monetary loss amount presented to this Court.

Finally, it is worth noting that other damage caused by Mr. Jones's financial misconduct and the misrepresentation of his accounting credentials has required a significant amount of time and effort to remediate. The Hawks Foundation had to engage outside counsel to help reinstate its nonprofit status, worked with its outside auditors to reconstruct its financial statements, and had to prepare and file several years of delinquent tax returns. The Hawks spent countless hours with American Express cleaning up its corporate credit card program, closing out accounts, and fixing security protocols. The Hawks legal department spent hundreds of hours conducting the internal investigation and assisting with the criminal investigation and prosecution. The Hawks Accounting and Finance Department spent untold hours repairing internal financial reports and summaries that turned out to be inaccurate due to Mr. Jones's manipulation and incompetence. None of these costs are encompassed by the relevant loss amount upon which Mr. Jones is being sentenced nor the restitution sought herein.

### Conclusion

The Hawks appreciate the opportunity to explain to the Court the substantial financial and non-financial harm caused by Mr. Jones's criminal conduct, and the Company is grateful to the USAO and the FBI for expeditiously bringing this matter to justice.

Mr. Jones's actions were not isolated or momentary lapses in judgment, but a prolonged abuse of trust that resulted in significant loss, disruption, and lasting harm to the Company and its employees. The Company respectfully asks the Court to impose a sentence that reflects the seriousness of Mr. Jones's offenses, that fully accounts for the harm he caused, and that will deter other executives entrusted with positions of authority from exploiting that trust or attempting to evade responsibility for their misconduct. Such a sentence is necessary not only to hold Mr. Jones accountable, but also to reinforce the importance of integrity and accountability in corporate leadership.



Finally, as set forth above, the Hawks seek restitution in the amount of $183,972.69, which is comprised of:

- $50,000 for the Hawks insurance policy deductible; and
- $133,972.69 in professional fees and expenses incurred by the Hawks in connection with the criminal investigation and prosecution.

Sincerely,

Scott Wilkinson (Apr 6, 2026 15:10:15 EDT)

T. Scott Wilkinson, Esq.
Executive Vice President & Chief Legal Officer
Atlanta Hawks & State Farm Arena

Attachments

cc:    Special Agent Kelsey Palermo, FBI (via e-mail, w/attachments)
       Allie Chinsky, Associate General Counsel, Atlanta Hawks (via-email, w/ attachments)
       David M. Chaiken, Chaiken Ghali LLP (via e-mail, w/ attachments)

9

# EXHIBIT 1

**(Declaration in Support of Atlanta Hawks Victim Impact Statement)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA

V.

LESTER T. JONES, JR.

CRIMINAL ACTION NO.

1:25-CR-458-JPB

**DECLARATION OF DAVID M. CHAIKEN IN SUPPORT OF
ATLANTA HAWKS VICTIM IMPACT STATEMENT**

1.  My name is David M. Chaiken. I am a resident of Fulton County, Georgia. I am over the age of eighteen, suffer from no legal disabilities, and have personal knowledge of the facts declared herein and know them to be true and correct.

2.  I submit this Declaration in support of the victim impact statement provided by ATL Hawks, LLC (the "Hawks" or the "Company") in this case. In particular, this Declaration is intended to explain the nature and amount of professional fees and costs incurred by the Hawks as a result of the Hawks' internal investigation into the Defendant's misconduct and the Hawks' participation in, and assistance to, the Government's investigation and prosecution to help the Court determine the amount of loss resulting from the offense under Section 2B1.1 of the U.S. Sentencing

1

Guidelines and to support the Government's request for restitution to the Hawks under the Mandatory Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA").

3.  I am a co-founder and partner with Chaiken Ghali LLP, a boutique white collar litigation and government investigations law firm based in Atlanta, Georgia. My practice focuses on representing companies and individuals in white collar criminal matters, federal grand jury investigations, government enforcement actions, and complex civil litigation. I also regularly lead internal investigations on behalf of management, boards of directors, and board committees into employee and management misconduct within public and private companies, non-profit organizations, and other entities. I also represent officers and employees in internal investigations being conducted by other counsel. I have been licensed to practice law in Georgia since 2002 and in California since 2004.

4.  Between September 2007 and December 2016, I served as an Assistant U.S. Attorney in the Economic Crimes Section of the U.S. Attorney's Office for the Northern District of Georgia, focusing on the investigation and prosecution of federal fraud and financial crime cases.

5.  I represent the Atlanta Hawks in this case.

**Internal Investigation**

6.  In connection with the Company's termination of the Defendant for unrelated reasons in late June 2025, the Hawks discovered a significant number of suspicious transactions in the Defendant's corporate American Express credit card account, part of the Hawks corporate credit card program for which the Defendant had been serving as administrator.

7.  On July 3, 2025, the Company engaged Chaiken Ghali LLP to assist in conducting an internal investigation to determine the scope of any misconduct and identify any losses.

8.  On behalf of the Hawks, Chaiken Ghali LLP in turn engaged Natalie S. Lewis, a forensic accountant with the global consulting firm J.S. Held LLC ("JS Held"), to assist with the internal investigation.

9.  Beginning in early July 2025 and continuing through mid-August 2025, the Hawks internal counsel, Chaiken Ghali, and JS Held conducted an internal investigation into the suspicious credit card transactions and related matters. The Hawks internal counsel, Chaiken Ghali, and JS Held  conducted witness interviews of over a dozen individuals, gathered and reviewed relevant electronic communications, and collected and analyzed a number of documents, both internally

3

and from third-parties, including company policies and human resources records, financial transaction records, and expense reimbursement records.

10. The investigation ultimately revealed that, over an eight-year period from May 2017 through June 2025, the Defendant had perpetrated two different schemes to defraud the Company, consisting of (a) the Defendant's submission of fraudulent expense reimbursement requests to the Hawks (often relying on fictitious and altered invoices), and (b) the Defendant's misuse of the corporate American Express credit card program that he administered to charge millions of dollars in personal expenses to Hawks corporate credit cards and cause the Company to pay for them. The two schemes resulted in an agreed theft loss in the amount of $3,764,514.30.

### Criminal Referral & USAO Investigation

11. On August 18, 2025, the Company (through Chaiken Ghali) contacted federal law enforcement to have a preliminary discussion about the findings from its internal investigation. The Company was invited to present its findings to the U.S. Attorney's Office for the Northern District of Georgia ("USAO") and the FBI, and Chaiken Ghali and the Hawks internal counsel thereafter made a presentation to the USAO and the FBI on September 10, 2025.

**Criminal Proceedings**

12. On October 29, 2025, the USAO filed a Criminal Information charging the Defendant with one count of wire fraud, in violation of 18 U.S.C. § 1343, in connection with his schemes to defraud the Hawks.

13. On December 16, 2025, the Defendant entered a guilty plea to the Criminal Information before this Court, and the case was set for sentencing.

14. Between September 10, 2025 and the present, the USAO and the FBI made numerous requests for information and documents from the Hawks to assist with the criminal investigation and prosecution, including information about the forensic analysis of the losses attributable to the offense, aspects of the Hawks electronic expense reimbursement platforms and corporate credit card program, the Defendant's employment history and responsibilities with the Hawks and his prior employment with The Home Depot, and other issues.  Some of these requests resulted in lengthy written submissions by the Hawks, conference calls, and a detailed in-person presentation by the Hawks (through J.S. Held, Chaiken Ghali, and internal counsel) to the USAO, FBI, and the Defendant's attorney on February 6, 2026.

5

**Relevant Legal Authority**

**Inclusion of Professional Fees & Costs in Loss Under Section 2B1.1**

15. Professional fees and costs incurred by a corporate victim to conduct an internal investigation constitute "reasonably foreseeable pecuniary harm that resulted from the offense" under Section 2B1.1 of the U.S. Sentencing Guidelines where "the defendant knew or, under the circumstances, reasonably should have known," that such fees and costs "were a potential result of the offense" (U.S.S.G. § 2B1.1 cmt. n.3(A)), and provided that such fees and costs were not incurred "primarily to aid the government in . . . the prosecution and criminal investigation of an offense." *Id*. § 2B1.1 cmt. n.3(D)(ii). In this case, based on the Defendant's training, experience, role in the Hawks organization, and visibility into the Hawks financial reporting and internal controls over financial reporting—including his interactions with the Hawks outside accounting firm, KPMG—there can be no question but that Defendant knew or reasonably should have known that his financial misconduct would trigger an internal investigation and the concomitant costs thereof.

16. Applying these rules, courts in this circuit and others have included such expenses in the loss amount at sentencing under Section 2B1.1. *See, e.g., United States v. Corbett*, 921 F.3d 1032, 1042 (11th Cir. 2019) (opining that costs of victim

6

hospital's internal investigation into insider identity theft scheme (fees paid to outside consulting firms to assist in identifying and notifying patients whose information had been compromised) were properly included in the Section 2B1.1 loss amount because the investigation was a direct consequence of the defendant hospital employee's wrongdoing—separate and apart from any government investigation—and "[t]hat a hospital will spend resources to investigate and remedy the theft of the identifying and medical information of thousands of its patients is virtually the definition of "reasonably foreseeable." (emphasis in original)); *United States v. Tomlin*, 501 Fed. App'x 864, 867-68 (11th Cir. 2012) (concluding that costs of government agency's internal investigation (in the form of the salaries of the investigating agents) prompted by defendant's false report were properly included in Section 2B1.1 loss amount); *United States v. Moles*, 242 Fed. App'x 125, 127 (4th Cir. 2007) (opining that fees paid by victim company to accounting firm to assist with internal investigation into its bookkeeper's embezzlement scheme were properly included in 2B1.1 loss amount, including fees "incurred to discover and correct the defendant's intentional misstatements she made to cover up her criminal conduct"); *United States v. DeRosier*, 501 F.3d 888, 895 (8th Cir. 2007) (opining that bank's legal fees and costs incurred to conduct internal investigation into loan scheme by bank employee were properly included in Section 2B1.1 loss amount and

7

noting that because defendant "was an employee of the bank and her loans were obtained from those she knew through the bank—it was reasonable and foreseeable that [the victim]'s internal audit team would investigate one of their employees who was involved in acquiring loans from bank customers"); Office of the General Counsel, U.S. Sentencing Commission, Primer: Loss Calculation Under § 2B1.1 (2025) at 22 (same).

### Restitution for Professional Fees & Costs

17.In contrast, restitution is not available for professional fees and costs incurred by a corporate victim to conduct a private investigation before any government investigation begins, such as its own internal investigation. *Lagos v. United States*, 138 S. Ct. 1684, 1688–90 (2018). However, restitution is available for professional fees and costs incurred by a corporate victim "during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4); *see United States v. Kanyadan*, No. 4:23-CR-00028-WMR-WEJ (N.D. Ga.), Doc. No. 212 at 84:18-85:9, 115:2-5 (awarding restitution to corporate victim for $359,609.41 in professional fees paid by victim to Alston & Bird LLP and Deloitte in connection with government investigation and prosecution, and $29,444.85 paid by victim to Alston & Bird to prepare victim impact statement); *United States v. Afriyie*, 27 F.4th 161, 170 (2d Cir. 2022) (victim

8

attorneys' fees recoverable under Section 3663A(b)(4)); *United States v. Avenatti*, No. (S1) 19 CR. 373 (PGG, 2022 WL 452385, at *8 (S.D.N.Y. Feb. 14, 2022), *aff'd*, 81 F.4th 171 (2d Cir. 2023) ("restitution under the MVRA is available for attorneys' fees incurred in connection with services that were invited, required, requested, or otherwise induced by the Government." (summarizing cases)); *United States v. Fiorentino*, 149 F. Supp. 3d 1352, 1364 (S.D. Fla. 2016) ("Attorneys' fees incurred by the victim are recoverable pursuant to [Section 3663A(b)(4)]").[1]

18. For professional fees and costs to be eligible for restitution, the offense at issue must be a qualifying conviction for purposes of the MVRA. This prerequisite is satisfied here because the MVRA mandates criminal restitution for "offense[s] against property under [Title 18]," and the offense of conviction—wire fraud under 18 U.S.C. § 1343—constitutes such an offense. 18 U.S.C. § 3663A(c)(1)(A)(ii). In addition, the fees and costs must have been necessary and the direct and proximate result of the defendant's criminal conduct. 18 U.S.C. § 3663A(b)(4). This

---

[1]    The Third Circuit recently held that the MVRA does not authorize restitution for attorneys' fees (*United States v. Abrams*, 165 F.4th 784 (3d Cir. 2026)), but subsequent to that decision the Government has continued to defend district court decisions in this Circuit awarding attorneys' fees under Section 3663A(b)(4), arguing that such awards should not be categorically disallowed and that the district court has discretion to determine in each case which expenses were necessary and foreseeable. *See United States v. Kanyadan*, No. 25-11043-GG, Br. of Appellee at 56; *United States v. Sheppard*, No. 24-12873-HH, Br. of Appellee at 29.

prerequisite is also established here because it was necessary for the Hawks and the Hawks' outside counsel and forensic accountants to confer with the USAO and the FBI in the course of the criminal investigation and prosecution of the Defendant, to answer questions and provide information and documents to the USAO and the FBI to assist the investigation and prosecution, and to attend certain proceedings in the criminal case; it was foreseeable that the Hawks would incur professional fees and costs in doing so; and thus the professional fees and costs were directly and proximately caused by the Defendant's misconduct.

### Allocation of Professional Fees & Costs to Loss and Restitution

19. From the time of Chaiken Ghali's engagement in early July 2025 through the date of this Declaration, I oversaw the legal work performed by Chaiken Ghali and the consulting and forensic accounting work performed by J.S. Held in connection with this matter, and I can attest to the necessity, reasonableness, and foreseeability of the professional fees and expenses that were incurred. Through March 31, 2026, the Hawks have incurred $454,820.68 in professional fees and costs in this matter.

20. To prepare this Declaration, I carefully reviewed all of the Chaiken Ghali and J.S. Held invoices for this matter to date to segregate fees and costs resulting from the Hawks internal investigation, fees and costs resulting from the Hawks assistance with the criminal investigation and prosecution, and fees and costs resulting from

10

other aspects of the engagement, such as the Hawks meetings and negotiations with the team's insurance carrier, Liberty Mutual.

21. For purposes of this analysis, I attributed to the internal investigation the fees and costs of assessing and advising on the scope of the internal investigation and identifying relevant witnesses and documents; collecting, reviewing, and analyzing relevant documents; preparing for, conducting, and traveling to and from witness interviews; preparing drafts of witness interview memoranda and editing, revising, and finalizing witness interview memoranda and exhibits; conferring about and advising on strategy and investigative findings, and preparing, reviewing, analyzing, editing, and finalizing financial summaries and spreadsheets to calculate and memorialize the losses resulting from the fraud. I excluded fees and costs incurred assisting with the USAO and FBI's investigation and prosecution, fees and costs incurred in negotiations and communications with the Hawks insurance carrier, and other fees and costs that were not part of the internal investigation.

22. This analysis identified professional fees and costs attributable to the internal investigation in the total amount of $280,442.50, as set forth in the chart below:

**Internal Investigation Fees & Costs (2B1.1)**

| Firm | Professional Fees | Costs |
|---|---|---|
| Chaiken Ghali LLP | $105,110.00 | $0.00 |
| J.S. Held LLC | $174,472.75 | $859.75[2] |
| Subtotals | $279,582.75 | $859.75 |
| | | |
| Total Fees & Costs | $280,442.50 | |

23. In support of the reasonableness of these fees and costs, I can further attest that in order to control fees, the Chaiken Ghali and J.S. Held investigative teams were leanly staffed, and were primarily comprised of a single partner and a single associate; and the Hawks internal counsel took on a significant share of the investigative work and analysis, including preparing for and conducting certain witness interviews without outside counsel or J.S. Held, and collecting and reviewing documents and communications.

---

[2]    JS Held's costs consisted of parking to attend witness interviews and client meetings and a court reporter fee for transcribing an electronically-recorded interview of the Defendant.

12

24. The internal investigation fees and costs were reasonable and foreseeable to the Defendant, and they should be included in the loss amount under Section 2B1.1 for sentencing purposes.

25. To calculate the professional fees and costs that are eligible for restitution (*i.e.*, the fees and costs attributable to the Hawks assistance with the criminal investigation and prosecution and attendance at proceedings in the criminal case), I carefully reviewed the billing invoices for this matter to identify all work performed by Chaiken Ghali and J.S. Held that was "invited, required, requested, or otherwise induced by the Government." *United States v. Avenatti*, No. (S1) 19 CR. 373 (PGG, 2022 WL 452385, at *8 (S.D.N.Y. Feb. 14, 2022), *aff'd*, 81 F.4th 171 (2d Cir. 2023). This work included responding to requests for documents and information from the USAO and the FBI, conducting additional fact-gathering and analyses in response to such requests, preparing for meetings and discussions with the USAO and the FBI, advising the Company and its employees on the requests and other interactions with the USAO and FBI, preparing for and presenting to the USAO and the FBI on September 10, 2025 and February 6, 2026, once such presentations had been requested or invited by the USAO and the FBI, preparing this Declaration, and assisting with and advising on the Hawks victim impact statement. I excluded from these calculations fees and costs incurred in conducting the internal investigation,

13

fees and costs incurred in negotiations and communications with the Hawks insurance carrier, and other fees and costs that were not incurred in connection with the Hawks assistance with the criminal investigation or attendance at proceedings in the criminal case.

26. This analysis identified professional fees and costs attributable to the criminal investigation and prosecution in the total amount of $133,972.69, as set forth in the chart below:

**Criminal Investigation Fees & Costs (MVRA)**

| Firm | Professional Fees | Costs |
|---|---|---|
| Chaiken Ghali LLP | $109,700.00 | $17.69 |
| J.S. Held LLC | $24,255.00 | $0.00 |
| Subtotals | $133,955.00 | $17.69 |
|  |  |  |
| Total Fees & Costs | $133,972.69 |  |

27. Microsoft Excel spreadsheets summarizing the excerpts of the billing invoices and time entries upon which the above restitution calculations are based are attached hereto as Exhibit A (Chaiken Ghali LLP) and Exhibit B (J.S. Held LLC), by date, timekeeper, and rate. Because both firms employed block billing, portions of certain

14

time entries have been redacted to remove certain work from the restitution calculations, and corresponding deductions have been made for that work. As above, I can attest to the necessity, foreseeability, and reasonableness of the fees incurred.

28. In submitting summary excerpts of the billing invoices for this matter in connection with this Declaration, the Hawks do not waive, and do not intend to waive, any privileges or rights to confidentiality protecting the Hawks communications and consultations with its internal and external legal counsel and advisors in this matter, including but not limited to the attorney-client privilege, the common interest or joint defense privilege, and the attorney work product privilege.

## Conclusion

29. Based on the foregoing, professional fees and costs in the amount of $280,442.50 should be included in the loss amount for sentencing purposes under Section 2B1.1, and professional fees and costs in the amount of $133,972.69, should be awarded to the Hawks as part of the Court's restitution order. To clarify, the Hawks are not seeking restitution for any fees or expenses incurred by the Company in conducting its internal investigation into the Defendant's misconduct, only that which was incurred in connection with the Company's participation in the Government's investigation and prosecution and fall squarely within the scope of recoverable restitution under the MVRA.

30. Finally, the Company has not been compensated by insurance or any other source with respect to the professional fees and costs for which it seeks restitution herein

I declare under penalty of perjury that the foregoing is true and correct. Executed this __6th__ day of April, 2026.

_____
David M. Chaiken
Chaiken Ghali LLP

16

# EXHIBIT A

**Exhbit A to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**Chaiken Ghali LLP Legal Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|---|---|---|---|---|---|---|---|---|---|
| 8/20/2025 | David Chaiken | Call with S Wilkinson re strategy and logistics for 9/10/25 DOJ presentation, inventory of documents to provide to DOJ, outstanding items and tasks: ▮▮▮▮ | 0.7 | 800 | 560 | 1024 | Paid | -0.1 | -80 |
| 8/27/2025 | David Chaiken | Call with N Lewis re victim bank accounts and related information in preparation for DOJ presentation | 0.3 | 800 | 240 | 1024 | Paid | | |
| 8/29/2025 | David Chaiken | Call and email communications with S Wilkinson re status of upcoming DOJ presentation preparation | 0.2 | 800 | 160 | 1024 | Paid | | |
| 9/3/2025 | David Chaiken | ▮▮▮▮▮▮ begin drafting outline for 9/10 DOJ criminal referral presentation; draft email to S Wilkinson, A Chinsky, and N. Lewis re follow-up questions for same; email communications with S Wilkinson, A Chinsky, and N Lewis re supplemental J Browning interview and salary/loss issue for DOJ | 5.2 | 800 | 4160 | 1028 | Paid | -3 | -2400 |
| 9/7/2025 | David Chaiken | Finish reviewing notes, JSH report and schedules, and interview memoranda and drafting 9/10 DOJ presentation outline; review emails from S Wilkinson re Hawks operating account for Amex payments/advances; S Coley/Foundation tax returns and procedures, and L Jones termination meeting; review POL summaries and exhibits per revised POL numbers and draft email to JSH requesting revised spreadsheets per same for DOJ materials | 3.8 | 800 | 3040 | 1028 | Paid | | |
| 9/8/2025 | David Chaiken | Review and finalize draft 9/10 DOJ presentation outline; email communications with S Wilkinson and A Chinsky re same and attaching same for review with note; email communications with S Wilkinson re exhibits for DOJ presentation, devices at Russell Building, and related presentation logistics; ▮▮▮▮ call with S Wilkinson and A Chinsky re strategy and logistics for DOJ presentation; analyze privilege issues; ▮▮▮▮ | 5.8 | 800 | 4640 | 1028 | Paid | -1.5 | -1200 |
| 9/9/2025 | David Chaiken | ▮▮▮▮ prepare DOJ presentation exhibits; revise 9/10 DOJ presentation outline per investigative limitations; assemble key documents for DOJ (USB) and prepare cover letter for same; prepare for DOJ presentation | 6.3 | 800 | 5040 | 1028 | Paid | -1.5 | -1200 |
| 9/10/2025 | David Chaiken | Prepare for and conduct criminal referral presentation to DOJ and FBI with S Wilkinson and A Chinsky; travel to and from U.S. Attorney's Office for same; draft talking points re same for S Wilkinson and forward same by email with note | 4.2 | 800 | 3360 | 1028 | Paid | | |

**Exhbit A to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**Chaiken Ghali LLP Legal Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|------|------|-------------|------|------|-----------|----------------|----------------|-----------------|----------------|
| 9/11/2025 | David Chaiken | Text communications with S Wilkinson re AUSA case assignment and names; assemble control set of DOJ referral materials for client and draft email to S Wilkinson and A Chinsky re same and re privilege issues; ███ ████████ | 3.7 | 800 | 2960 | 1028 | Paid | -1 | -800 |
| 9/12/2025 | David Chaiken | Email communications with S Wilkinson and A Chinsky re J Browning interview follow-up and documents; review J Browning whiteboard photograph received from S Wilkinson | 0.2 | 800 | 160 | 1028 | Paid | | |
| 9/14/2025 | David Chaiken | Email communications with S Wilkinson re summary of prior meetings with J Browning; email communications with J Browning re S Kon reporting chain and notes re issues with L Jones financial model/ownership report; ████████ | 0.7 | 800 | 560 | 1028 | Paid | -0.2 | -160 |
| 9/15/2025 | David Chaiken | ███ review notes of J Browning/L Jones meetings received from J Browning ████████ review Jones/Harris ticket-transfer and shopping emails for supplemental production to DOJ; email communications with A Chinsky re same and re Allegiant legal department contact; follow-up email communications with A Chinsky re same; draft email to DOJ re supplemental materials for criminal referral and forward same to client for review by email with note | 2 | 800 | 1600 | 1028 | Paid | -0.5 | -400 |
| 9/16/2025 | David Chaiken | Email communications with S Wilkinson and A Chinsky re approval for supplemental materials for DOJ-FBI; call with A Chinsky re Y Harris ticket transfers and review JS Held schedule per same; finalize and send email to DOJ attaching supplemental materials | 0.6 | 800 | 480 | 1028 | Paid | | |
| 9/18/2025 | David Chaiken | Call with J Browning re S Kon issues and 6/30/25 discovery of suspicious Amex charges; call with S Wilkinson re status | 0.4 | 800 | 320 | 1028 | Paid | | |
| 9/19/2025 | David Chaiken | Email communications with S Wilkinson and A Chinsky re supplemental DOJ materials and DOJ follow-up/check-in | 0.1 | 800 | 80 | 1028 | Paid | | |
| 10/8/2025 | David Chaiken | Call with S Wilkinson re criminal investigation; review email from S Wilkinson to DOJ re L Jones Delta travel; review voicemail message from AUSA Malloy re guilty plea resolution; conference call with S Wilkinson and AUSA Malloy re same and re additional information for DOJ; post-call with S Wilkinson re same | 0.5 | 800 | 400 | 1047 | Paid | | |
| 10/9/2025 | David Chaiken | Review notes and proof of loss report and begin drafting detailed factual background for possible criminal charges per DOJ request | 3.2 | 800 | 2560 | 1047 | Paid | | |

**Exhbit A to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**Chaiken Ghali LLP Legal Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|------|------|-------------|------|------|-----------|----------------|----------------|-----------------|----------------|
| 10/10/2025 | David Chaiken | Continue drafting detailed factual background for possible criminal charges per DOJ request; review DOJ presentation exhibits per 1/23/25 Wynn-related correspondence, invoice, and expense report; review JS Held schedules per credit card spending examples; revise detailed draft factual background per same; call with AUSA Malloy re same; revise draft factual background per same; revise and finalize same for review by client; draft email to S Wilkinson and A Chinsky attaching draft for review and re follow-up factual and legal issues | 7.1 | 800 | 5680 | 1047 | Paid | | |
| 10/12/2025 | David Chaiken | Review client edits to draft factual background received from S Wilkinson; email communications with S Wilkinson, A Chinsky, J Browning, and N Lewis re fact-check and next steps; review additional edits and comments from N Lewis per same; revise and finalize draft factual background per same and circulate to client team and JS Held for approval to send to DOJ | 0.8 | 800 | 640 | 1047 | Paid | | |
| 10/13/2025 | David Chaiken | Email communications with client team re additional J Browning edits to draft factual background; revise draft factual background per same and per J Browning edits; email communications with AUSA Malloy re same and attaching draft factual background for review; call with AUSA Malloy re same and re additional details, logistics, and timing; email communications with S Wilkinson summarizing DOJ call; follow-up email communications with AUSA Malloy re Jacksonville Jaguars credit card administrator case and related documents; follow-up email communications with S Wilkinson re anticipated DOJ public disclosures | 2.2 | 800 | 1760 | 1047 | Paid | | |
| 10/14/2025 | David Chaiken | Email communications with DOJ re Hawks authorization re Workday server location; email communications with S Wilkinson and A Chinsky re same | 0.2 | 800 | 160 | 1047 | Paid | | |
| 10/15/2025 | David Chaiken | Call from FBI/DOJ re Workday server information and Amex payment information; review email from Workday legal department re same and forward same to FBI/DOJ; follow-up email communications with Workday and FBI/DOJ re server details; email communications with S Wilkinson and A Chinsky re same and re ACH/banking information; conference call with S Wilkinson and A Chinsky re anticipated DOJ public disclosures; follow-up email communications with DOJ/FBI re bank account/ACH questions | 1.3 | 800 | 1040 | 1047 | Paid | | |
| 10/16/2025 | David Chaiken | Call with DOJ/FBI re interstate wire issues, status, next steps, and public disclosures; draft email to S Wilkinson and A Chinsky summarizing same; call from AUSA Malloy re follow-up interstate wire issue re Workday platform | 0.8 | 800 | 640 | 1047 | Paid | | |
| 10/17/2025 | David Chaiken | Conference call with DOJ/FBI and S Wilkinson re initial appearance date, forfeiture issues, and JS Held financial reports and summaries | 0.5 | 800 | 400 | 1047 | Paid | | |
| 10/17/2025 | Michael Duffey | Phone call with D Chaiken, S Wilkinson, and DOJ re prosecution status and next steps | 0.5 | 500 | 250 | 1047 | Paid | | |

**Exhbit A to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**Chaiken Ghali LLP Legal Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|---|---|---|---|---|---|---|---|---|---|
| 10/28/2025 | David Chaiken | Numerous calls from AUSA Malloy re clarifications re 2017 transactions in JS Held analyses and L Jones responsibilities per expense reimbursement platform; review draft Criminal Information and duties language from AUSA Malloy; follow-up voicemail and email communications with AUSA Malloy re same; email communications with S Wilkinson, A Chinsky, J Browning, and N Lewis re 2017 transactions and business travel | 0.7 | 800 | 560 | 1047 | Paid | | |
| 10/29/2025 | David Chaiken | Travel to and from US Courthouse for L Jones initial appearance in criminal case; attend L Jones initial appearance before MJ Sommerfeld; text communications with S Wilkinson and A Chinsky re district judge assignment; confer with AUSA Malloy and FBI SA Palermo re same and re next steps; confer with J Kim re defense request for Company laptop computer; review final Criminal Information received from DOJ; draft email to S Wilkinson and A Chinsky attaching same and re Jones Company laptop request; call with AUSA Malloy and AUSA Sistla re J Kim request for Hawks laptop; review email from AUSA Malloy re supplemental document request from J Kim; conference call with S Wilkinson and A Chinsky re 10/29 initial appearance proceedings, judge assignment, Jones counsel issues, and J Kim laptop/document request and options for responding; call with AUSA Malloy re same | 4.5 | 800 | 3600 | 1047 | Paid | | |
| 10/29/2025 | David Chaiken | D Chaiken parking at US Courthouse for L Jones initial appearance | 1 | 17.69 | 17.69 | 1047 | Paid | | |
| 10/30/2025 | David Chaiken | Call from AUSA Malloy re J Kim laptop request; review notes and draft letter to J Kim re Company laptop and data request; review and revise same; email communications with S Wilkinson and A Chinsky re same and attaching draft letter for review; review comments on draft letter received from A Chinsky; email communications with re S Wilkinson and A Chinsky same and re T Schlenk revelations; revise draft letter to J Kim per edits from A Chinsky | 2.9 | 800 | 2320 | 1047 | Paid | | |
| 10/31/2025 | David Chaiken | Revise letter to J Kim re laptop/data request; email communications with S Wilkinson and A Chinsky re same and attaching redline; call with AUSA Malloy re discovery-related delay; revise letter to J Kim per additional edits from A Chinsky; finalize and send letter to J Kim; email communications with S Wilkinson and A Chinsky re update from AUSA Malloy and re Saks chargeback issues vis-a-vis DOJ and restitution | 1.8 | 800 | 1440 | 1047 | Paid | | |
| 11/3/2025 | David Chaiken | Call from AUSA Malloy re status and possible 11/4 meeting/call with USAO/FBI re expense report backup materials for J Kim; call with S Wilkinson re same | 0.3 | 800 | 240 | 1070 | Paid | | |
| 11/4/2025 | David Chaiken | Calls from AUSA Malloy and FBI re expense reimbursement documents and Amex documents for L Jones counsel; email communications with S Wilkinson and team re revelations re Home Depot theft allegations | 0.7 | 800 | 560 | 1070 | Paid | | |
| 11/5/2025 | David Chaiken | Call with S Wilkinson and A Chinsky re disclosure of prior L Jones Home Depo theft to DOJ | 0.2 | 800 | 160 | 1070 | Paid | | |
| 11/6/2025 | David Chaiken | Call and voicemail communications with AUSA Malloy re new L Jones HD theft revelation; email communications with S Wilkinson and A Chinsky re same; review correspondence re loss and restitution numbers; draft email to S Wilkinson and team re loss and restitution numbers for DOJ and attaching draft chart re same | 0.6 | 800 | 480 | 1070 | Paid | | |

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|---|---|---|---|---|---|---|---|---|---|
| 11/13/2025 | David Chaiken | Review email from JS Held re status of American Express losses/chargebacks | 0.1 | 800 | 80 | 1070 | Paid | | |
| 11/21/2025 | David Chaiken | Call and email communications with AUSA Malloy re letter from defense counsel re loss analysis; review and analyze defense letter; draft email to S Wilkinson and A Chinsky re same and re possible response and attaching letter for review; follow-up calls and email communications with S Wilkinson, A Chinsky, J Browning, and N Lewis re same; email communications with AUSA Malloy re anticipated ETA for responses to defense letter; follow-up text communications with client team and N Lewis re same; call from AUSA Malloy re latest developments, new loss amount stipulation in plea agreement, and proposed defense meeting re loss numbers; text communications with client team and JS Held re same | 2.7 | 800 | 2160 | 1070 | Paid | | |
| 11/22/2025 | David Chaiken | Text communications with client team and JS Held re next steps for responding to defense information request, MBS forgeries, restitution, victim impact filing, and related issues; review draft bullet responses to defense letter received from N Lewis; review notes, N Lewis draft bullets, and proof of loss report, and prepare letter to DOJ re defense loss questions | 5.9 | 800 | 4720 | 1070 | Paid | | |
| 11/23/2025 | David Chaiken | Revise draft letter to DOJ re loss analysis per comments from S Wilkinson; circulate redline to S Wilkinson per same; text communications with S Wilkinson re strategy and possible in-person meeting with L Jones and counsel; assemble exhibits and revise draft letter to DOJ per same; circulate revised draft, redline, and proposed exhibits to client team and JS Held for review with note | 2.3 | 800 | 1840 | 1070 | Paid | | |
| 11/24/2025 | David Chaiken | Finalize and send letter to DOJ re loss analysis by email with note; review correspondence from S Wilkinson re American Express chargebacks; review L Jones office search proceeds received from S Wilkinson; call from AUSA Malloy re document questions; text communications with S Wilkinson and client team re DOJ financial disclosures/deposition and documents and funds recovered from L Jones office | 0.8 | 800 | 640 | 1070 | Paid | | |
| 11/25/2025 | David Chaiken | Call from AUSA Malloy re additional defense questions re loss analysis; review email from defense counsel re same; follow-up call with AUSA Malloy re request for in-person meeting with JS Held; draft email to S Wilkinson, A Chinsky, J Browning, and JS Held re same; follow-up call with AUSA Malloy; follow-up email communications with client team and JS Held; call with N Lewis re carryover balance issue and related issues; review JS Held loss spreadsheet per same; draft explanations for DOJ per MBS forgery, unreimbursed business expenses, and credit card payments and forward same to client team and JS Held for review; finalize and send same to DOJ; call with AUSA Malloy re status of plea decision, text communications with S Wilkinson re same | 2.7 | 800 | 2160 | 1070 | Paid | | |

**Exhbit A to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**Chaiken Ghali LLP Legal Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|---|---|---|---|---|---|---|---|---|---|
| 12/1/2025 | David Chaiken | Text communications with A Chinsky re status/plea scheduling; email communications with AUSA Malloy re same; call from AUSA Malloy re forensic accounting questions; draft email to JS Held and client team re same; follow-up call from AUSA Malloy re classification of credit card charges; follow-up email communications with JS Held and client team re same; call with N Lewis re credit card loss methodology; draft email for DOJ re same and circulate to N Lewis and client team for review; revise, finalize, and send same to AUSA Malloy | 2.8 | 800 | 2240 | 1098 | Paid | | |
| 12/5/2025 | David Chaiken | Email communications with DOJ re L Futrell-related loss amount/travel; email communications with S Wilkinson re same and re FBI/DOJ cooperation issues and discovery limitations; email communications with S Wilkinson and A Chinsky re draft L Futrell interview memorandum for FBI; review internal Hawks email correspondence received from S Wilkinson re L Futrell travel expenses per M Proctor information, internal reports, and related investigation | 2.8 | 800 | 2240 | 1098 | Paid | | |
| 12/6/2025 | David Chaiken | Review and propose edits to draft L Futrell interview memorandum received from S Wilkinson; prepare exhibits to same; draft email to S Wilkinson and A Chinsky attaching redlined draft and proposed redactions per same; finalize, redact, and send interview memorandum and exhibits to DOJ/FBI by email with note per client approval; follow-up email communications with S Wilkinson and A Chinsky re same and attaching file copies | 1.8 | 800 | 1440 | 1098 | Paid | | |
| 12/16/2025 | David Chaiken | Email communications with S Wilkinson and A Chinsky re possible press; review PACER docket per scheduling; attend L Jones guilty plea hearing before J Boulee with S Wilkinson and A Chinsky; pre- and post-meetings with S Wilkinson, A Chinsky, and DOJ re same; travel to and from US courthouse for same | 2.3 | 800 | 1840 | 1098 | Paid | | |
| 12/17/2025 | David Chaiken | Analyze victim's rights issues vis-a-vis DOJ loss and restitution numbers; call from AUSA Malloy re dates/scheduling for JS Held/forensic accounting meeting with DOJ and Jones defense counsel; draft email to S Wilkinson and team re same; follow-up email communications with S Wilkinson and team re strategy for same; review 3/30/25 Mercedes sale contract and American Express letters received from S Wilkinson per loss and forfeiture issues; email communications with S Wilkinson and team and same and re logistics for 2/6/26 DOJ meeting | 1.6 | 800 | 1280 | 1098 | Paid | | |
| 12/17/2025 | Kamal Ghali | Confer with D Chaiken re victims rights notifications and restitution strategy issues | 0.4 | 800 | 320 | 1098 | Paid | | |
| 12/18/2025 | David Chaiken | Review correspondence with S Wilkinson and N Lewis re 2/6/26 DOJ meeting; draft email to DOJ re Mercedes-Benz sale contract and 2/6/26 JS Held meeting logistics and forward same to S Wilkinson for review with note; email communications with S Wilkinson and A Chinsky re deadline for parties sentencing briefs; finalize and send email to AUSA Malloy re 2/6/26 forensic accounting meeting logistics and 3/30/25 Mercedes sale contract | 0.9 | 800 | 720 | 1098 | Paid | | |

**Exhbit A to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**Chaiken Ghali LLP Legal Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|---|---|---|---|---|---|---|---|---|---|
| 1/6/2026 | David Chaiken | Begin drafting letter to DOJ re loss and restitution issues in preparation for 2/6/26 meeting with forensic accounting firm and defense counsel requested by DOJ | 1 | 800 | 800 | 1139 | Paid | | |
| 1/7/2026 | David Chaiken | Email communications with DOJ and B Switzer re 2/6/26 meeting and 1/28/26 deadline for defense questions re J.S. Held forensic accounting analysis; email communications with S Wilkinson, A Chinsky, J Browning, and N. Lewis re same | 0.2 | 800 | 160 | 1139 | Paid | | |
| 1/8/2026 | David Chaiken | Continue drafting letter to DOJ re loss issues per 2/6/26 meeting with forensic accounting firm and defense counsel requested by DOJ | 0.6 | 800 | 480 | 1139 | Paid | | |
| 1/9/2026 | David Chaiken | Continue drafting letter to DOJ re loss issues in preparation for 2/6/26 meeting with DOJ, defense counsel, and J.S. Held | 2.8 | 800 | 2240 | 1139 | Paid | | |
| 1/21/2026 | David Chaiken | Review letter, VNS information, and victim impact questionnaire received from DOJ; email communications with S Wilkinson re same and attaching same for review with note | 0.3 | 800 | 240 | 1139 | Paid | | |
| 1/21/2026 | Michael Duffey | Confer with D Chaiken re victim loss and restitution issues | 0.1 | 500 | 50 | 1139 | Paid | | |
| 1/29/2026 | David Chaiken | Call with DOJ re status of defense issues/challenges with Hawks forensic analysis; email communications with S Wilkinson, A Chinsky, and JS Held re same; follow-up email communications with S Wilkinson and A Chinsky re sentencing procedure and timing | 0.3 | 800 | 240 | 1139 | Paid | | |
| 1/29/2026 | David Chaiken | Review email from DOJ attaching defense counsel questions and issues re Hawks forensic analysis; review attached defense counsel letter and spreadsheet per same | 1 | 800 | 800 | 1139 | Paid | | |
| 1/29/2026 | David Chaiken | Email communications with S Wilkinson, A Chinsky, and JS Held re letter from DOJ and defense counsel re forensic analysis/loss issues | 0.2 | 800 | 160 | 1139 | Paid | | |
| 1/29/2026 | David Chaiken | Review prior DOJ correspondence in preparation for meeting with client and JS Held to discuss defense questions re forensic analysis | 0.4 | 800 | 320 | 1139 | Paid | | |
| 1/29/2026 | David Chaiken | Video call with JS Held, S Wilkinson, and A Chinsky re questions and issues in defense letter re Hawks forensic analysis | 1 | 800 | 800 | 1139 | Paid | | |
| 1/29/2026 | David Chaiken | Call from DOJ (FBI joins) re JS Held forensic analysis questions and DOJ call with defense counsel | 0.4 | 800 | 320 | 1139 | Paid | | |
| 1/29/2026 | David Chaiken | Review documents/data received from S Wilkinson re Hawaii expenses, scouting expenses, and phone expenses challenged by defense; follow-up email communications with S Wilkinson, A Chinsky, and JS Held re same | 0.4 | 800 | 320 | 1139 | Paid | | |
| 1/30/2026 | David Chaiken | Call from FBI re preliminary review and questions re 1/28/26 letter of B Switzer re forensic analysis; email communications with S Wilkinson, A Chinsky, and JS Held re same | 0.4 | 800 | 320 | 1139 | Paid | | |
| 1/30/2026 | David Chaiken | Call from DOJ re discussion with defense counsel re forensic analysis and next steps for resolution of loss and restitution numbers | 0.3 | 800 | 240 | 1139 | Paid | | |
| 1/30/2026 | David Chaiken | Review data from S Wilkinson re Hawks historical wireless phone billing and carriers per defense questions re Hawks forensic analysis; follow-up call and email communications with S Wilkinson re Home Depot background per DOJ request; review new spreadsheets/analysis received from JS Held and draft email to N Lewis re possible follow-up analysis and investigation re defense questions about forensic analysis; email communications with DOJ re restitution for attorney's fees and exemplar pleadings | 0.9 | 800 | 720 | 1139 | Paid | | |

**Exhbit A to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**Chaiken Ghali LLP Legal Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|---|---|---|---|---|---|---|---|---|---|
| 1/30/2026 | David Chaiken | Call with S Wilkinson re DOJ discussion, issues, and options and next steps for loss and restitution resolution | 0.2 | 800 | 160 | 1139 | Paid | | |
| 2/3/2026 | David Chaiken | Call with AUSA Malloy re upcoming 2/6/26 meeting to discuss forensic accounting analysis; email communications with S Wilkinson and AUSA Malloy re addresses for restitution payments; call and email communications with S Wilkinson and A Chinsky re timing, logistics, and strategy for victim impact submission and additional information from L Jones prior Home Depot employment | 1.4 | 800 | 1120 | 1169 | Billed | | |
| 2/4/2026 | David Chaiken | Call from AUSA Malloy re defense challenges to forensic analysis, strategy for same and for upcoming 2/6/26 meeting re same, possible continuance of sentencing hearing and Hawks position, and information and contacts re L Jones prior Home Depot employment; text communications with S Wilkinson, A Chinsky, and JS Held re same and re Hawks position re same; follow-up email communications with AUSA Malloy re Hawks position and next steps; call from AUSA Malloy re latest developments and requests regarding information and attendees for 2/6/26 meeting; email communications with S Wilkinson and AUSA Malloy with American Express contact information for restitution per DOJ request; conference call and email communications with S Wilkinson, A Chinsky, N Lewis, and J Browning re plan and issues for 2/6/26 forensic analysis meeting with defense counsel requested by DOJ; review and analyze draft analysis from N Lewis addressing defense challenges to Hawks/JS Held loss analysis; email communications with N Lewis re same; email communications with S Wilkinson and A Chinsky re gift card question; begin drafting outline for 2/6/26 forensic analysis presentation to defense and DOJ per DOJ request | 5.1 | 800 | 4080 | 1169 | Billed | | |
| 2/5/2026 | David Chaiken | Initial prep call with JS Held for 2/6/26 presentation to DOJ and defense counsel; MS Teams video call with JS Held, S Wilkinson, A Chinsky, and J Browning re same; review L Jones motion to continue sentencing; email communications with client team and JS Held re same and re scheduling/dates; voicemail communications with AUSA Malloy re 2/6/26 meeting; MS Teams video meeting with JS Held to prepare outline and strategy for 2/6/26 forensic accounting presentation to DOJ and defense counsel; email communications with S Wilkinson, A Chinsky, J Browning, and JS Held re exhibits/demonstratives for 2/6/26 presentation; finalize outline for presentation to DOJ/defense counsel | 7.7 | 800 | 6160 | 1169 | Billed | | |
| 2/6/2026 | David Chaiken | Conduct forensic accounting presentation at U.S. Attorney's office with JS Held, S Wilkinson, A Chinsky, and J Browning; post-meeting with DOJ re same; travel to and from US Courthouse for same | 4.2 | 800 | 3360 | 1169 | Billed | | |
| 2/9/2026 | David Chaiken | Review minute order continuing sentencing hearing and related deadlines to April 2026; call from AUSA Malloy re same and re status; email communications with S Wilkinson, A Chinsky, and J Browning re continuance of sentencing hearing and related dates; follow-up email communications with S Wilkinson re preparation and witnesses for sentencing hearing | 0.4 | 800 | 320 | 1169 | Billed | | |

**Exhbit A to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**Chaiken Ghali LLP Legal Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|---|---|---|---|---|---|---|---|---|---|
| 2/11/2026 | David Chaiken | Call and email communications with AUSA Malloy re status; email communications with S Wilkinson and A Chinsky re same | 0.3 | 800 | 240 | 1169 | Billed | | |
| 2/13/2026 | David Chaiken | Call and email from DOJ re defense position/resolution re Hawks loss analysis; email communications with S Wilkinson, A Chinsky, and JS Held re same | 0.2 | 800 | 160 | 1169 | Billed | | |
| 2/18/2026 | David Chaiken | Call and email communications with FBI SA Palermo re Home Depot information | 0.2 | 800 | 160 | 1169 | Billed | | |
| 2/18/2026 | David Chaiken | MS Teams video meeting with S Wilkinson, A Chinsky, and JS Held re loss/restitution modifications and next steps for preparing and finalizing revised loss spreadsheets for DOJ and defense counsel | 0.7 | 800 | 560 | 1169 | Billed | | |
| 2/19/2026 | David Chaiken | Review revised loss spreadsheets received from JS Held per DOJ request and related Hawks-JS Held correspondence re same; draft email to S Wilkinson, A Chinsky, and JS Held re comments and revisions to same | 0.8 | 800 | 640 | 1169 | Billed | | |
| 2/20/2026 | David Chaiken | Review and comment on revised draft loss spreadsheets received from JS Held; email communications with S Wilkinson, A Chinsky, and JS Held re same; draft email to DOJ and FBI attaching and explaining revised theft loss spreadsheet | 0.6 | 800 | 480 | 1169 | Billed | | |
| 2/27/2026 | David Chaiken | Call with S Wilkinson re draft victim impact statement | 0.2 | 800 | 160 | 1169 | Billed | | |
| 3/8/2026 | David Chaiken | Begin reviewing draft victim impact statement received from S Wilkinson | 0.4 | 800 | 320 | 1173 | Billed | | |
| 3/9/2026 | David Chaiken | Call with AUSA Malloy re restitution and victim impact statement timing and logistics | 0.2 | 800 | 160 | 1173 | Billed | | |
| 3/9/2026 | David Chaiken | Prepare chart summarizing restitution breakdown per request of USPO Greenberg and forward draft of same to S Wilkinson, A Chinsky, and N Lewis for review with note | 0.4 | 800 | 320 | 1173 | Billed | | |
| 3/10/2026 | David Chaiken | Call with S Wilkinson re DOJ discussions and preparation of victim impact statement | 0.2 | 800 | 160 | 1173 | Billed | | |
| 3/10/2026 | David Chaiken | Email communications with USPO Greenberg and AUSA Malloy re USPO request for breakdown of restitution numbers and attaching chart re same, and re status and logistics of victim impact submission | 0.3 | 800 | 240 | 1173 | Billed | | |
| 3/16/2026 | David Chaiken | Continue reviewing draft victim impact statement and declaration in support of victim professional fees received from S Wilkinson; revise and update attorneys' fees exhibit for declaration per 2026 billings to date; review and analyze draft forensic accountant fee schedule received from JS Held; review exemplar victim impact statement and declaration per same | 2.4 | 800 | 1920 | 1173 | Billed | | |
| 3/17/2026 | David Chaiken | Begin revising draft victim impact statement received from S Wilkinson; calls and email communications with USPO Greenberg re timing and status of victim impact statement and final loss and restitution calculations; confer with M Josephson re same; email communications with client re same; revise Chaiken Ghali and JS Held billing statement allocations per restitution and loss calculations | 2.9 | 800 | 2320 | 1173 | Billed | | |

**Exhbit A to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**Chaiken Ghali LLP Legal Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|---|---|---|---|---|---|---|---|---|---|
| 3/18/2026 | David Chaiken | Review order from J Boulee rescheduling sentencing hearing; email communications with S Wilkinson, A Chinsky, and N Lewis re same; call and voicemail communications with JS Held re fees exhibit for Hawks victim impact statement; additional revisions to same; begin revising draft declaration in support of Hawks victim impact statement | 2.4 | 800 | 1920 | 1173 | Billed | | |
| 3/23/2026 | David Chaiken | Review invoice summaries and continue revising draft declaration in support of victim impact statement | 2.8 | 800 | 2240 | 1173 | Billed | | |
| 3/24/2026 | David Chaiken | Call from DOJ re status of victim impact statement and sentencing logistics | 0.2 | 800 | 160 | 1173 | Billed | | |
| 3/25/2026 | David Chaiken | Finish reviewing and revising declaration in support of victim professional fees and costs; confer with M Josephson and M Duffey re restitution issue; additional revisions to draft victim impact statement | 3.4 | 800 | 2720 | 1173 | Billed | | |
| 3/25/2026 | Michael Duffey | Confer with D Chaiken and M Josephson re restitution issue | 0.4 | 500 | 200 | 1173 | Billed | | |
| 3/25/2026 | Matthew Josephson | Strategy discussion with D Chaiken regarding restitution issue | 0.4 | 800 | 320 | 1173 | Billed | | |
| 3/26/2026 | David Chaiken | Continue reviewing and revising draft victim impact statement | 3.1 | 800 | 2480 | 1173 | Billed | | |
| 3/29/2026 | David Chaiken | Finish revising draft victim impact statement, declaration, and Exhibits A and B; draft email to S Wilkinson and A Chinsky re same and attaching drafts for review | 3.2 | 800 | 2560 | 1173 | Billed | | |
| 3/31/2026 | David Chaiken | Email communications with DOJ re loss/restitution; email communications with S Wilkinson and A Chinsky re same | 0.2 | 800 | 160 | 1173 | Billed | | |
| | | **Total =** | | | **115957.69** | | | | |
| | | | | | | | | | |
| | | **Deductions =** | | | **-6240** | | | | |
| | | **Adjusted Total after Deductions =** | | | **$109,717.69** | | | | |

# **EXHIBIT B**

**Exhbit B to Declaration of David M. Chaiken in Support of Atlanta Hawks Victim Impact Statement**
**J.S. Held LLC Fees and Costs**

| Date | User | Description | Time | Rate | Total Fees | Invoice Number | Invoice Status | Time Deductions | Fee Deductions |
|---|---|---|---|---|---|---|---|---|---|
| 10/12/2025 | Natalie Lewis | ▮▮▮▮▮▮ Review draft factual background for possible DOJ charges. | 2.00 | 550.00 | 1,100.00 | INV-01US-03419431 | Paid | -0.7 | -385 |
| 11/21/2025 | Natalie Lewis | Emails with client and counsel. Review B. Switzer letter. Call with counsel. | 1.20 | 550.00 | 660.00 | INV-01US-0330842 | Paid | | |
| 11/22/2025 | Natalie Lewis | Review analysis and exhibits. Response to B. Switzer letter. Emails with counsel and client. | 3.70 | 550.00 | 2,035.00 | INV-01US-0330842 | Paid | | |
| 11/25/2025 | Natalie Lewis | Call with counsel. Emails with client and counsel. | 0.50 | 550.00 | 275.00 | INV-01US-0330842 | Paid | | |
| 11/25/2025 | Natalie Lewis | Review Jones's American Express statements and summarize activity. | 2.70 | 550.00 | 1,485.00 | INV-01US-0330842 | Paid | | |
| 12/1/2025 | Natalie Lewis | Emails with client and counsel. Call with counsel. Review response. | 0.80 | 550.00 | 440.00 | INV-01US-0342297 | Paid | | |
| 12/17/2025 | Natalie Lewis | Emails with client and counsel regarding timing of meeting with DOJ. | 0.40 | 550.00 | 220.00 | INV-01US-0342297 | Paid | | |
| 1/7/2026 | Natalie Lewis | Strategy for cost and fee recovery | 0.20 | 550.00 | 110.00 | INV-01US-0353098 | Paid | | |
| 1/13/2026 | Natalie Lewis | Cost and fee recovery analysis | 0.40 | 550.00 | 220.00 | INV-01US-0353098 | Paid | | |
| 1/27/2026 | Natalie Lewis | Cost and fee recovery allocation | 1.20 | 550.00 | 660.00 | INV-01US-0353098 | Paid | | |
| 1/29/2026 | Natalie Lewis | Review BVF letter and spreadsheet. Call and emails with client and counsel. | 2.40 | 550.00 | 1,320.00 | INV-01US-0353098 | Paid | | |
| 1/30/2026 | Natalie Lewis | Review BVF spreadsheet and explanation of transactions categorized as personal | 2.90 | 550.00 | 1,595.00 | INV-01US-0353098 | Paid | | |
| 2/2/2026 | Natalie Lewis | Review BFV spreadsheet and transactions. | 3.80 | 550.00 | 2,090.00 | INV-01US-0358921 | Billed | | |
| 2/3/2026 | Natalie Lewis | Review BFV spreadsheet and transactions. | 3.10 | 550.00 | 1,705.00 | INV-01US-0358921 | Billed | | |
| 2/4/2026 | Natalie Lewis | Meeting with counsel and client regarding DOJ meeting. | 1.70 | 550.00 | 935.00 | INV-01US-0358921 | Billed | | |
| 2/4/2026 | Natalie Lewis | Review BFV spreadsheet and transactions. | 3.30 | 550.00 | 1,815.00 | INV-01US-0358921 | Billed | | |
| 2/5/2026 | Natalie Lewis | Review BFV spreadsheet and transactions. | 1.10 | 550.00 | 605.00 | INV-01US-0358921 | Billed | | |
| 2/5/2026 | Natalie Lewis | Prep for meeting with the DOJ and defense counsel. | 7.20 | 550.00 | 3,960.00 | INV-01US-0358921 | Billed | | |
| 2/6/2026 | Natalie Lewis | Prep for meeting with the DOJ and defense counsel. Meeting with DOJ, BFV, Mr. Jones, and Hawks. | 3.30 | 550.00 | 1,815.00 | INV-01US-0358921 | Billed | | |
| 2/18/2026 | Natalie Lewis | Call with client and counsel regarding revised loss. Update spreadsheets. | 1.40 | 550.00 | 770.00 | INV-01US-0358921 | Billed | | |
| 2/19/2026 | Natalie Lewis | Update spreadsheets. Emails with client and counsel. | 0.80 | 550.00 | 440.00 | INV-01US-0358921 | Billed | | |
| 2/20/2026 | Natalie Lewis | Update spreadsheets. Emails with client and counsel. | 0.20 | 550.00 | 110.00 | INV-01US-0358921 | Billed | | |
| 3/18/2026 | Natalie Lewis | Call with counsel. Review time entries for restitution and 2b1.1 loss. | 0.50 | 550.00 | 275.00 | | Draft | | |
| | | **Total =** | | | 24,640.00 | | | | |
| | | **Deductions =** | | | (385.00) | | | | |
| | | **Adjusted Total After Deductions =** | | | $24,255.00 | | | | |