**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.1:25-CR-458-JPB** |
| | ) | |
| **LESTER T. JONES, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT LESTER T. JONES, JR.'S SENTENCING MEMORANDUM

Lester T. Jones, Jr. ("Defendant" or "Mr. Jones") will appear before this Court for sentencing at 3pm ET on April 21, 2026. His sentencing follows a plea of Guilty, pursuant to a written plea agreement with the United States, accepted by this Court on December 16, 2025 [Dkt. 12], to a Criminal Information [Dkt. 1]. The count of conviction is 18 U.S.C. § 1343 (wire fraud). Mr. Jones is extremely remorseful for the harm he has caused including loss to the Atlanta Hawks in excess of $3.7 million.

Mr. Jones respectfully requests that this Court issue a 41-month sentence of probation under home-confinement restriction, require as special conditions that he complete community service and receive mental health therapy and treatment, plus impose an appropriate period of supervised release.

No matter the sentence imposed, Mr. Jones will never again appear before this or any other Court as an accused. Whenever given the opportunity, he will re-build himself and his career, re-establish trust in the community, pay back his victims, provide healthcare to family members, and set a proper example for his children.

## I.    PROCEDURAL POSTURE

Mr. Jones waived indictment [Dkt. 3] and has been released on a $10,000 unsecured bond since his initial appearance and arraignment the same day [Dkts. 4, 6, 7]. He has complied with all conditions of his bond, (PSR ¶¶ 5), and the written plea agreement, including those relative to financial disclosure and forfeiture (Id. ¶¶ 158-159).

## II.    NO UNRESOLVED GUIDELINE ISSUES

There are no unresolved guideline issues for purposes of the Court's calculations. The parties agree the proper guideline calculation in this case yields a total offense level of 22, with a custody guideline range of 41-51 months, and the government has agreed to recommend a sentence at the low-end of that range (41 months). Pursuant to the plea agreement, Mr. Jones may request a lesser sentence.

Notably, Mr. Jones has zero criminal history and is a zero-point offender under U.S.S.G. §4C1.1. The parties agree Mr. Jones is eligible for the maximum possible credit for acceptance of responsibility under U.S.S.G. §3E1.1.

Mr. Jones does not challenge the loss and restitution calculations submitted to the Court, $3,764,514.30 and $3,898,486.99, respectively, as revised in the PSR.[1]

## III.    PROPOSED AMENDMENTS SUPPORT A VARIANCE

The United States Sentencing Commission has published three sets of proposed amendments to the 2026 Guidelines. The proposed amendments are in different stages of public comment periods and scheduled to be submitted to Congress on or before May 1, 2026. The proposed amendments are scheduled to take effect November 1, 2026. There are at least four that may guide the Court here.

### 1.    Inflationary Adjustment to §2b1.1 fraud loss adjustments.

The proposed amendments would amend §2B1.1 fraud loss table to adjust for inflation using a specific multiplier derived from the Bureau of Labor Statistics' Consumer Price Index and simple rounding rules extrapolated from the provisions set forth in section 5(a) of the Federal Civil Penalties Inflation Adjustment Act of 1990. This is the same methodology the Commission used in 2015. See U.S.S.G. App. C, amend. 791 (effective Nov. 1, 2015).

Under the proposed amendment, the fraud loss table would reflect (in relevant part) as follows:

---

[1] References to the PSR herein reflect information as provided in the unofficial/informal PSR received from Probation Officer Kelly Greenberg on 4/8/26.

**(b) Specific Offense Characteristics**

(1) If the loss exceeded ~~$6,500~~ $9,000, increase the offense level as follows:

| [Multiplier] | Loss (Apply the Greatest) | Increase in Level |
|---|---|---|
| … | | |
| [1.33] | (I) More than ~~$1,500,000~~ $2,000,000 | add **16** |
| [1.43] | (J) More than ~~$3,500,000~~ $5,000,000 | add **18** |

Application of this amendment reduces Mr. Jones's offense level by two points.

## 2.    Merging of §2b1.1 specific offense level adjustment ranges.

Separately, the proposed amendments ("Restructuring the Loss Table") would consolidate the Chapter 2 fraud loss table so that offenses involving more than $1,500,000 of loss but less than $9,500,000 would all fall under §2b1.1(b)(1)(I) and thus receive a 16-level increase.[2] Application of this amendment reduces Mr. Jones's offense level by two points.

## 3.    Creation of §3E1.2 to promote post-offense rehabilitation efforts.

The proposed amendments would add a new Chapter Three adjustment at §3E1.2 (Post-Offense Rehabilitation) providing a reduction if the defendant demonstrates positive post-offense behavior or rehabilitative efforts. The proposed amendment sets forth two options for the adjustment.

---

[2] This proposed amendment is based on current (versus inflation adjusted) fraud loss figures.

Option 1 provides in subsection (a) for a reduction [of 1, 2, or 3 levels] when the defendant demonstrates prior to sentencing positive post-offense behavior or rehabilitative efforts. Subsection (b) instructs the court that, in determining whether a defendant qualifies for the reduction, it shall consider the actions and efforts voluntarily initiated / undertaken by the defendant for the benefit of the defendant's own rehabilitation, victim(s) of the offense, community, or other people. It then provides a non-exhaustive list of factors for the court to consider in making this determination. Subsection (c) is not relevant here.

Option 2 provides in subsection (a) for a reduction [of 1, 2, 3, or 4 levels] if the defendant demonstrates a sustained commitment to positive behavioral change evidenced by post-offense behavior or rehabilitative efforts that go beyond the typical actions undertaken by defendants prior to sentencing. Subsection (b) instructs the court that, in determining whether a defendant qualifies for the reduction, it shall consider the actions and efforts voluntarily initiated / undertaken by the defendant, and the timing of such actions and efforts, for the benefit of the defendant's own rehabilitation, victim(s) of the offense, community, or other people. It then provides some broad examples of the types of efforts the court should consider for the adjustment, instead of a list of considerations like the one provided in Option 1.

Application of this amendment would reduce Mr. Jones's offense level by somewhere between one and four additional points.

5

4.      **Expansion of Zones B and C of the Sentencing Table.**

The proposed amendments would expand Zones B and C of the Sentencing Table via changes to §5B1.1 (Imposition of a Term of Probation) and 5C1.1 (Imposition of a Term of Imprisonment). The changes, discussed in greater detail *infra*, will expressly authorize probationary sentences for defendants like Mr. Jones who land in expanded Zone B.

## IV.   RELEVANT FACTS AND TIMELINE

Mr. Jones has never quite "fit the mold." A young black boy growing up in rural Greenville, Mississippi, he started the integration of the white-only baseball league in his town. (PSR ¶¶ 93, 116). By all accounts, he was a great ball player, but that didn't exempt him from common racial slurs, epithets, and reactions, (id. ¶¶ 113, 116), cross burnings on his grandmother's lawn, (id. ¶ 113), or even KKK members chasing him through the woods, (id. ¶ 114). It was quite the tight-rope walk for a young boy, as he was reminded frequently. (Id. ¶ 114-115). Mr. Jones was allowed to play baseball with his white teammates, but he had better not find himself on the wrong side of the town during a basketball game or a school dance, as he learned over-and-over again through physical beatings and law enforcement encounters. (Id. ¶¶ 116, 117). Mr. Jones recalled in a very sensitive PSR interview,

> *Integration was difficult because people were upset with you just wanting to belong. I saw people protest because they didn't want us to go to school. It was known you*

> *didn't go to go to the other schools. There were rules with*
> *me going to the school.*

(Id. ¶ 116). Even in the context of youth baseball, teams forfeited games and refused to play against him. (Id.). This was all happening in the 1980's and 1990's.[3]

Mr. Jones did not quite fit in with the black kids either—*they called him "confusion boy"*—because Lester was a high-achiever and did not talk or act like his counterparts from the neighborhood. (PSR ¶ 119). But he was not welcome among the people who talked more like he did either. (Id.) (describing the difficulty of existing in one world with two separate realities and never feeling as though he fit in); (id.) ("[B]ecause he is articulate and does not speak with slang, people perceive him as uppity or 'talking white.'").

His own father minimized his academic achievements and suggested it was all a waste of time. (Id. ¶ 102) ("I don't know why they're spending time on you."); (id.) ("It's hard to see you're smart cause you're so dumb."). This was a theme—Lester was not good enough for his father, who thought the only way out was through baseball—but his father was not supportive either. Rather, he frequently reminded Lester how hopeless he was both physically and verbally. Mr. Jones described his upbringing as "scary, traumatic, and painful … liv[ing] in a constant state of fear and

---

[3] For reference, Jackie Robinson first played baseball as a Brooklyn Dodger on April 15, 1947.

walking on eggshells" due to the domestic violence in the home, as well as the constant systemic racism he and his family experienced. (PSR ¶ 100).

For example, one day Lester was out in the yard hitting a tennis ball on a string. A 10-year old boy, he was practicing, as he often did. Unhappy with a particular swing, Lester's father went into a violent rage, proclaiming, "You don't know what you're doing." (PSR ¶ 103). His father snatched the baseball bat from Lester and struck him so hard, he broke Lester's wrist. (Id.). Mr. Jones's wrist is noticeably disfigured, still makes a clicking sound to this day, and causes pain when over-utilized. Doctors have told Mr. Jones it was severely broken and would need to be re-broken in order to heal correctly. (Id. ¶ 130). Unable to take Mr. Jones to see a doctor at the time, for many reasons, his mother did the best she could to ice Mr. Jones's wrist with a bag of frozen peas. (Id. ¶ 103).

Lester's father used whatever he could get his hands on to beat Mr. Jones and his brother including extension cords, switches, bats, and hammers. (PSR ¶ 103). One night, his father nearly choked him to death in his sleep before his mother intervened. (Id.). Mr. Jones was groomed not to tell anybody what was going on—*it was better just to lie about it*—he feared what would happen if he told the truth. (Id. ¶ 104).

The Jones family lived in abject poverty. Mr. Jones grew up in the Section 8 projects. (Id. ¶ 99). There were two bedrooms in the house; Lester and his siblings

shared one room. (Id.). The family often went without utilities for weeks at a time. (Id.). There was no washer or drier. (Id.). Many days, the only meal Mr. Jones ate was the breakfast provided at school. (Id.). Frequently, even when there was food available, Mr. Jones's father would deny him food, as punishment, because he felt Lester did not deserve it. (Id. ¶ 105).

Lester adores his mother—they speak almost every day—it kills him that he could not protect her from his abusive father. (Id. ¶¶ 94, 100, 108). Mr. Jones suffers from an extreme sense of "survivor's remorse." (Id. ¶ 108). His father abused drugs, spent time in jail, fathered several children out of wedlock, and physically and verbally assailed Mr. Jones, his mother, and one or more of his siblings. (Id. ¶¶ 93, 100, 106-108). Police were called, and his father was arrested on several occasions. (Id. ¶ 101). Lester and his siblings were raised to hide the abuse. Naturally, it got worse and worse until Lester could not handle his reality. (PSR ¶¶ 107-109).

Lester reached his breaking point and effectively ran away at age 16. (PSR ¶ 108). Unable to deal with his life at home, he applied to attend boarding school at the Mississippi School for Mathematics and Science, a gifted school chartered by the State. (Id.). He was accepted into the program. (Id.). This was an escape for Mr. Jones—*he never returned home*—during breaks, he would couch-surf or even once found a charitable teacher to take him in. (Id.).

9

Mr. Jones would go on to earn his BS from Xavier University (accounting, statistics, and advanced mathematics) in 2001 and his Masters of Finance from Tulane University in 2002. (PSR ¶ 109, 145).[4] After graduate school, he worked his way up the corporate ladder in finance and accounting roles; he was eligible to sit for the CPA Exam but never needed to. (Id. ¶¶ 145-147). In 2010, he got married to Crescenta Jones, who had a four-year old daughter named Koya. (Id. ¶ 109).[5]

Through application of talents, hard work, and blessings, he eventually earned his way into a role with the Atlanta Hawks. Working in professional sports was a dream come true. Mr. Jones loved his job and loved the people with whom he worked. He is extremely remorseful and is reduced to tears every time he faces the reality of his actions, particularly the friendships and trust he violated.

About his conduct, he has said,

> *... I take full responsibility for my conduct and the harm it has caused. I understand that my actions have caused not only financial harm, but also emotional harm, and violated the trust of the victims, my coworkers (including but not limited to those that reported to me), friends, family, loved ones, and my extended network across the industry. My decision making and subsequent behavior weakened and undermined the integrity of internal systems and frameworks designed to function on honesty and accountability.*

---

[4] Tulane University was unable to provide certified records confirming his Master of Finance due to records losses caused by catastrophic events of Hurricane Katrina.

[5] Mr. Jones is in daily contact with Koya and his younger sister Jessica.

> *Over the past several months I have been forced to face the decisions and circumstances that have brought me to this low point. To say I am extremely remorseful is a vast understatement. I am committed to make amends for the damage I have caused. I deeply regret betraying the trust of those affected, and the pain of the hurt I have caused is something I carry with me daily and will for the rest of my life. The disappointment of my friends and colleagues who entrusted me with a role I loved will forever be etched in my memory as a sad and embarrassing reminder of my actions.*
>
> *Through professional treatment and self-reflection, I have begun the long journey to face what I have done and am grateful to have the opportunity to continue forward on the path of rehabilitation and accountability to myself and others.*

(PSR ¶ 68). He has given several other heartfelt apologies to members of the organization and vows to do whatever in his power to redress the harm he has caused.

Mr. Jones struggles to look himself in the mirror and answer the difficult questions of why and how he could have done what he did. He makes no excuses for his conduct. Undersigned counsel respectfully submits, however, that his conduct cannot be properly understood without considering the crossroads of two major life-events against the backdrop of his personal background and upbringing. In the 2020-2021 time frame, two critical events were unfolding:[6]

- After several years in the Hawks organization, it was announced that Mr. Jones would become the VP of Finance. While he should have been thrilled, this was bittersweet for Mr. Jones because it meant he had been

---

[6] These events are explained in the bullets that follow in the words of counsel.

passed up for the Director of Finance role. The Director role ultimately went to an outsider to the organization with a marketing background and ostensibly less relevant experience than Mr. Jones. Coincidentally, the person chosen for the Director role happened to be a white man.

- Meanwhile, around the same time, Mr. Jones was going through a difficult separation and divorce from his ex-wife. This was extremely difficult for obvious reasons, but for two additional reasons specific to Mr. Jones. *First*, Mr. Jones was torn apart by shame and self-guilt for allowing his marriage to slip away, which summonsed awful memories of the transgressions of his father. *Second*, his ex-wife made false accusations against Mr. Jones to extort monetary settlement and alimony, creating additional financial pressure within an already hyper-emotional proceeding for Mr. Jones.[7]

Mr. Jones was asked about this in his PSR Interview, specifically what brought him to the circumstances of the instant offense.  He answered (in his own words),

> *It was around the time of my divorce, and I think having financial pressure of having Koya and alimony. And I think it had to do with avoidance. It was a lot of escape and avoidance and not facing my failures, personal and professional. It was a big snowball effect. It wasn't a good situation. It was not easy… Both personal and professional bad decisions. When I sat down with the government and I saw the charges I had made it was an instant trigger of what I was going through at that time. The avoidance was a lot of personal and professional failures. Not being good enough, not having a particular status, and being overlooked… It shouldn't be me… it shouldn't be me that put them [the AH] in this situation. I*

---

[7] His ex-wife's daughter, who has a different biological father, ultimately chose to and was ordered to live with Mr. Jones over her biological mother. (PSR ¶ 110). Mr. Jones cares deeply for Koya, calls her his "daughter," and raises her as his own. (Id.). *One of the hardest moments of his life was when he had to explain to Koya what he did to the Hawks*.

> *never should have done what I did. I never should have*
> *made the decisions I made.*

(PSR ¶ 121). No doubt, 2020 and 2021 were some of his "darkest times." (Id. ¶ 42). It was during this time period that Mr. Jones demonstrably lost control.[8]

Rather than get the mental health help he so desperately needed—*this is obvious to him now in hindsight*[9]—Mr. Jones made the worst decisions of his life and stole $3.7 million from the Hawks organization. It started off small, and, in typical fashion, snowballed out of control. (Id. ¶ 45). Mr. Jones quickly found himself caught in an endless cycle of trying to escape reality by chasing unrealistic expectations and lifestyle choices. The pattern is reminiscent of his youth in which he yearned for acceptance but always came up short. And just as he had learned to do as a young boy, he kept quiet, lied about, and either hid or ran from his problems.

There is no justification or excuse, nor does Mr. Jones offer any. Rather, Mr. Jones accepts full responsibility for his actions. He is embarrassed and ashamed of himself. He struggles to understand how he could have possibly made the

---

[8] Before 2020, the fraud loss attributable to Mr. Jones's conduct is less than $20,000, per the analysis of J.S. Held and the Hawks, of the $3,764,514.30 total. (PSR ¶ 67). It is primarily the loss *after* these events that drives the guideline range calculation.

[9] Mr. Jones respectfully submits the childhood trauma and effects on Mr. Jones's mental and emotional health, (*see* PSR ¶ 135; **Ex. A**), speak for themselves. Mr. Jones has been working with medical professionals to develop an appropriate diagnosis and treatment plan to address his mental health issues. He has seen several doctors and completed multiple evaluations.

decisions he made and the magnitude of the harm he has caused. But he is facing it head on.[10]

## V.    APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS

After calculating the discretionary guideline range as the "starting point and initial benchmark," the Court must determine an appropriate sentence upon consideration of all the factors set forth by Congress in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49–51 (2007).

### 1.    The Nature of the Circumstances of the Offense and the History and Characteristics of the Defendant.

Mr. Jones's upbringing is impossible for most Americans to imagine. Not only is it extremely sad and tragic, but more importantly, the pervasive childhood trauma he experienced contributed directly to his offense conduct. Studies show that the presence of *four or more (of the original 10)* adverse childhood experiences (ACEs)[11] are associated with a range of negative outcomes in adulthood. Mr. Jones scores an 8 out of 10. (*See* **Ex. A**). This is significant. Studies show that this type of extreme childhood adversity is associated with a wide range of adult criminality.[12]

---

[10] Mr. Jones is committed to redressing the harm caused by his malefactions including through payment of restitution, re-establishing the trust of his family and others the community, re-building himself, rebuilding stability in his life, and setting a proper example for his children. (PSR ¶ 124).

[11] ACEs refers to the "Adverse Childhood Experience Questionnaire for Adults," *see* **Exhibit A**, which asks 10 questions.

[12] *See, e.g.*, National Library of Medicine, *Adult Childhood Experiences and Adult*

Beyond the offense conduct, Mr. Jones is described by those who know him best as a genuinely good person. He is a man of faith who enjoys reading, playing music, and spending time with his family. (Id. ¶ 148). This is what the Hawks saw in Lester too. He is a family man described as the "glue that has held [the] family together"—he looks after his younger sister,[13] his mother,[14] an adopted daughter,[15] and even a daughter made known to him in adulthood[16]—all agree he puts others before himself.

---

*Criminality: How Long Must We Live before We Possess Our Own Lives?*, Spring 2013 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC3662280/).

[13] Mr. Jones's younger sister Jessica was approximately three years old when he left home. Still, Mr. Jones "has always taken on a caregiver role and has consistently been a responsible and dependable presence within [the] family…Even now, he continues to walk alongside [Jessica] in life." *See* **Jessica Jones Letter of Support**, attached as **Exhibit B**, at pg. 2 ("Even with the 13-year age difference, he is truly my best friend.").

[14] "He has always taken on a caregiver role, often putting others before himself and making sure those around him were supported. He is truly the glue that has held our family together in many ways." *See* **Ernestine Jones Letter of Support**, attached as **Exhibit C**, at pg. 2.

[15] *See* **Ex. B** at 2 ("He provided [Koya] with a stable home, financial support, and the emotional guidance she needed during that time. His willingness to take on that responsibility and ensure her well-being reflects the depth of his character and his commitment to caring for others."); **Koya Parks Letter of Support**, attached as **Exhibit F** ("After the divorce, he could've easily kicked me out, left me in the past, and gone about his life as a bachelor. Instead, he still showed me unconditional love and support for years…I've never told him this but if I were to walk down the aisle one day and have a father- daughter dance, I'd want it to be beside him.").

[16] (PSR ¶ 111).

Mr. Jones is a natural caregiver. In fact, prior to the instant offense, the plan was for Mr. Jones's sick mother (Ernestine) to move to Atlanta to reside full-time with Mr. Jones, who would provide full-time care for her. (PSR ¶ 123). She is currently without a long-term plan for healthcare and living arrangements and has very limited other options. (Id.).[17] Ernestine is currently living between two houses that are hours apart in Mississippi. In the past few years, her care needs have become much more significant. (PSR ¶¶ 94-95, 123). For a variety of reasons, Mr. Jones was and remains the person best positioned to assist Ernestine with living arrangements and healthcare, aspects of her life that are not stable at present. (Id.). A non-custodial sentence with home detention restrictions would enable Mr. Jones to provide his mother with the housing and healthcare that she needs, which other family members are unable to provide.

He likewise regularly visits another mother figure (Dorothy Frazier) at the assisted living facility where she resides and has provided help with her care plans. (Id. ¶ 148).[18] He is even attempting to re-establish a relationship with his father in

---

[17] Although departures were largely removed from the 2025 Sentencing Guidelines in lieu of a simpler approach, old U.S.S.G. § 5H1.6 is instructive as a policy statement to guide the Court in its § 3553(a) analysis. Here, all factors previously considered by Courts for departure purposes support a variance. Mr. Jones intends to present additional information for the Court's consideration at sentencing.

[18] *See* **Dorothy Frazier Letter of Support**, attached as **Exhibit D**, at 1 ("I have always believed you can tell a lot about a person by whether they are willing to come to a place like this and spend time with someone. From the moment I Met Lester, he was kind, warm, and respectful. Over time, he has continued to come visit me—

end-of-life stages, despite a complex past. (Id. ¶ 93); (**Ex. B** at 2) (explaining that Lester "continues to show up and offer support" for his father "following his recent medical diagnosis" despite the complex background and serious trauma he caused Lester during childhood). At his core, Lester "is someone who loves deeply, gives selflessly, and strives to do right by others." (**Ex. B** at 2).

Supporters express confidence that Mr. Jones is not defined by his crime, and that he will grow from it. "Throughout his life, he has worked hard to create opportunities, even when they were not readily available to him." (**Ex. C** at 2). He has demonstrated he will use this experience "as motivation to build something better [] not only for himself but for others as well." (Id.).

Mr. Jones has pursued and been approached about multiple job opportunities, but he has been unable to commit due to the pending sentencing. (Id. ¶ 149). In the meantime, Mr. Jones has demonstrated a "renewed focus" and "commitment to learning, growing, and ensuring that he moves forward in a more positive and responsible way." (**Ex. C** at 2). "[H]e is taking intentional steps to care for himself by engaging in therapy and prioritizing his mental well-being."). (**Ex. B** at 2).

---

sometimes even on his own."); **Donni Frazier Letter of Support**, attached as **Exhibit E**, at 1 (explaining care Mr. Jones has provided to her mother Dorothy) ("He has offered his time, assistance, and care without hesitation, helping with transportation and anything she may need. His actions during difficult times consistently reflect empathy, responsibility, and selflessness.")

**2.**     **The Need for the Sentence Imposed to (a) Provide Just Punishment for the Offense, (b) Afford Adequate Deterrence, (c) Protect the Public from Further Crimes of the Defendant, and (d) Provide the Defendant with Effective Training, Care, and Treatment.**

Mr. Jones understands the important role of sentencing in the criminal justice system. He respectfully submits that the publicity of his case[19] and the personal and professional consequences he has already faced (and will continue to face for the rest of his life) afford adequate general and specific deterrence. As a counter-balance, it is also important for the Court to signal to the public the importance and value placed by the criminal justice system on contrition, acceptance of responsibility, and commitment to redressing the harms caused by criminal conduct, including through post-offense rehabilitative efforts, as well as cost.[20]

In this case, any custodial sentence will punish, in addition to Mr. Jones, many other dependents who rely on Mr. Jones for familial, financial, and health-related support. Notably, though it is due to no fault of anybody except Mr. Jones, healthcare

---

[19] *See*, *e.g.*, https://www.nbcnews.com/sports/nba/ex-atlanta-hawks-executive-accused-stealing-millions-team-luxury-appar-rcna241915 (Dec. 16, 2025); https://www.cbsnews.com/atlanta/news/former-atlanta-hawks-finance-executive-pleads-guilty-in-3-8m-fraud-case/ (Nov. 4, 2025).

[20] According to a recent study published by the United States Courts, detaining a person before trial and then incarcerating them post-conviction is roughly 10 times more costly than supervising an individual in the community. *See*, "The Public Costs of Supervision Versus Detention" (June 5, 2025) (available at https://www.uscourts.gov/data-news/judiciary-news/2025/06/05/public-costs-supervision-versus-detention#:~:text=Supervision%20can%20save%20taxpayers%20tens%20of%20thousands,person%20in%20the%20community%20after%20sentencing**%20$4%2C742)).

18

and living arrangements for his mother (Ernestine) have been interrupted while he awaits a sentence because Mr. Jones cannot presently follow through with his commitment to her not knowing what the future holds. (*See* Section V(1) and n.16, *supra*). Others who will be affected include Dorothy Frazier (his mother-in-law to be), his terminally ill father, Koya (his adopted daughter), Jessica (his sister), an adult-aged daughter recently disclosed to him, and his fiancée Donni Frazier, who remains committed to "building a meaningful life together" with Mr. Jones. (**Ex. E** at 1), just to name a few.

As to sub-part (d), through much self-reflection and medical evaluation, Mr. Jones has come to realize that he needs significant, highly-specialized mental health treatment from physicians qualified to treat extreme early childhood and race-based trauma. He has begun that process, (*see*, Section V(4), *infra*; **Exhibits B** and **C**, *generally*), but just as it took decades for his trauma to manifest itself in objective dysfunction and mental health disorder, it will take many years and perhaps a lifetime of treatment to deal with all the damages caused by the trauma from which Mr. Jones suffers. Mr. Jones respectfully requests that such treatment be made a condition of any sentence imposed.[21]

---

[21] This is consistent with the recommendation from USPO. (PSR ¶ 138).

### 3.    The Kinds of Sentences Available.

From a pure guideline perspective, Mr. Jones is a Zone D offender. Thus, by reference to the applicable guidelines, Mr. Jones would be expected to receive a custodial sentence absent a significant variance. However, the zones, like the guidelines, are advisory only, and the appropriate sentence is left to the sound discretion of the Court after consideration of all the § 3553(a) factors.

Moreover, the proposed amendments to the U.S.S.G. also explicitly contemplate the expansion of Zones B and C of the sentencing table. Under Part B of the proposed amendments, expanded Zone B for offender in Criminal History Category I would include total offense level 9 (custodial range of 4-10 months) through total offense level 23 (custodial range of 46-57 months) and expressly authorize a sentence of probation for Mr. Jones, provided that the minimum term of imprisonment be satisfied by intermittent confinement, community confinement, or home detention, as provided by the schedule of substitute punishments at § 5C1.1(e).

### 4.    The Need to Avoid Unwanted Sentencing Disparities.

Before taking into account the unique circumstances and characteristics of this Defendant, national data reflects that similarly situated defendants (FY2020-2024, primary guideline §2B1.1, total offense level 22, CH category I) historically receive sentences on average that are 33 months (*i.e.*, 8 months below the low-end

guideline).[22] The facts and circumstances surrounding Mr. Jones's history and characteristics are certainly more mitigating than the average white collar defendant.

Mr. Jones also asks the Court to consider the proposed amendments to the U.S.S.G., which reflect the policy of the United States Sentencing Commission and its desire to reduce the guideline calculations and ranges relative to financial crimes under §2B1.1 through (1) inflationary adjustment(s), (2) blending of sub-section (I) and (J) of the fraud loss table into a single lesser enhancement level, (3) by providing additional reductions for post-offense rehabilitative conduct, and (4) by expanding Zone B to provide additional relief to zero-point, first time offenders like Mr. Jones in CH Category 1.

Specifically, regarding post-offense rehabilitative conduct, Mr. Jones respectfully submits that he has taken the following steps for the benefit of his own rehabilitation and to begin the path of redressing the harm caused to the victim(s) of his offense:

- Mr. Jones voluntarily disclosed and remitted six (6) valuable timepieces valued in excess of $750,000, suggesting and offering that the

---

[22] Note, this data all predates the proposed amendments to the U.S.S.G. discussed herein. As a practical effect, this means the data are inflated by comparison to future expected sentences.

liquidated proceeds could be used to compensate the victim(s); they were ultimately forfeited by the government (Id. ¶ 40).[23]

- Mr. Jones has been working with medical professionals to develop an appropriate diagnosis and treatment plan to address his mental health issues stemming from the severe trauma he experienced as a child. He has completed multiple evaluations with several different therapists, which ultimately resulted in a referral to Dr. Willie Campbell at Thriveworks Better Behavioral Health. Dr. Campbell was recommended after initial evaluations with two different provider groups (Dr. Mark Torphy, LMFT and Dr. Jenina Smith, LPC) for his specialty in childhood and race-based trauma.[24] Mr. Jones hoped to be able to provide a more fulsome report with this sentencing memorandum, however, the process takes time that Mr. Jones does not presently have.[25] Nevertheless, the general consensus among care

---

[23] Pursuant to the written plea agreement, the USAO for NDGA agreed to recommend to the Chief of the Money Laundering, Narcotics and Forfeiture Section ("MNF") of the US DOJ that property forfeited in this case be used to compensate the victim(s) specified in the restitution order.

[24] *See* bio available at https://thriveworks.com/therapist/ga/willie-campbell.

[25] Mr. Jones requested a continuance to allow the mental health evaluation and treatment process to further mature prior to sentencing, [Dkt. 19], but the requested continuance was not granted, [Docket Text entered February 9, 2026]. A mental health expert engaged for this purpose actually terminated its engagement with

providers has been that Mr. Jones's mental health will require significant therapy for many years to come. Mr. Jones's traumatic upbringing and the harm it has caused are very complex matters. He has taken the necessary steps to begin addressing these very serious medical concerns.

- Mr. Jones has been actively reviewing his finances with a financial consultant in an effort to reduce liabilities and minimize cash outflow obligations, all with an eye towards future financial health and ability to make restitution payments. (Id. ¶¶ 158-189). Prior to sentencing, Mr. Jones has successfully transferred title and payments related to the Maserati SUV out of his name. Mr. Jones has reduced household expenditures by eliminating cable TV, insurance, and other unnecessary costs. He has canceled and closed open credit lines, where possible, to prevent further exposure to debt except where necessary to live. He is currently receiving guidance regarding bankruptcy as a potential option to reorganize debts under federal protection with an eye toward a "fresh start" financially. In the meantime, he is preserving all assets and has disclosed them to the government.

---

Mr. Jones because the Court's provided timeline was insufficient, in their assessment, to complete the necessary scope of work.

Mr. Jones's case has progressed very quickly from charging to sentencing. Mr. Jones has created much positive momentum in a short time. He will continue his positive post-offense rehabilitative efforts to the best of his ability after his sentencing.

     **5.      The Need to Provide Restitution to Victims of the Offense.**

The sad reality of Mr. Jones's financial situation is that he does not have the present ability to satisfy his restitution obligations. (PSR ¶ 160). That said, he has made complete and accurate disclosures of all assets that may be available to satisfy restitution obligations and commits to doing everything in his power to pay back the amounts owed.

On balance, the best ability for Mr. Jones to make restitution to victims will come from opportunities to pursue gainful employment post-sentencing. This reality informs, in part, Mr. Jones's request for a non-custodial sentence. Fortunately, Mr. Jones is surrounded by family who will continue to love and support him as he turns the corner after sentencing and rehabilitates himself as a productive member of society. Given the opportunity, he will make good on his promises.

## VI.    CONCLUSION

Mr. Jones respectfully requests that the Court issue a 41-month sentence of probation under home-confinement restriction, require as special conditions that he complete community service and receive mental health therapy and treatment, plus impose an appropriate period of supervised release, as the sentence that is sufficient

but not harsher than necessary in light of all the factors the Court considers under 18 U.S.C. § 3553(a).

This 14th day of April, 2026.

Respectfully submitted,

/s/Brett A. Switzer
Brett A. Switzer, Esq.
Georgia Bar No. 554141

BERMAN FINK VAN HORN P.C.
3475 Piedmont Road, NE
Suite 1640
Atlanta, Georgia 30305
(404) 261-7711
bswitzer@bfvlaw.com

*Attorney for Defendant*
*Lester T. Jones, Jr.*

## <u>CERTIFICATE OF SERVICE</u>

I, Brett A. Switzer, Counsel for Lester T. Jones, Jr., hereby certify that I have filed ***Defendant Lester T. Jones's Sentencing Memorandum*** within and foregoing with the Clerk of Court using the CM/ECF system which will send notification to the United States.

This 14th day of April, 2026.

Respectfully submitted,

/s/Brett A. Switzer
Brett A. Switzer, Esq.
Georgia Bar No. 554141

BERMAN FINK VAN HORN P.C.
3475 Piedmont Road, NE
Suite 1640
Atlanta, Georgia 30305
(404) 261-7711
bswitzer@bfvlaw.com

*Attorney for Defendant*
*Lester T. Jones, Jr.*

26

## <u>CERTIFICATE OF SERVICE/COMPLIANCE</u>

I hereby certify that the foregoing document is formatted in Times New Roman typeface, size 14 pt., and prepared with the required margins in accordance with Local Rule 5.1B.

This 14th day of April, 2024.

Respectfully submitted,

/s/ Brett A. Switzer
Brett A. Switzer, Esq.
Georgia Bar No. 554141

BERMAN FINK VAN HORN P.C.
3475 Piedmont Road, NE
Suite 1640
Atlanta, Georgia 30305
(404) 261-7711
bswitzer@bfvlaw.com

*Attorney for Defendant*
*Lester T. Jones, Jr.*